**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John Leslie HEAD, Jr.,
Defendant-Appellant.**

No. 78–5094.

United States Court of Appeals,
Fifth Circuit.

Dec. 18, 1978.

Rehearing Denied Jan. 22, 1979.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Kendall W. Wherry, William F. Duane, Asst. U. S. Attys., Orlando, Fla., for plaintiff-appellee.

Before WISDOM, AINSWORTH and CLARK, Circuit Judges.

CHARLES CLARK, Circuit Judge:

John Leslie Head, Jr., was convicted by a jury of conspiracy to unlawfully import marijuana in violation of 21 U.S.C. §§ 952(a), 960, and 963. His appeal raises three procedural issues. First, the conduct of the Assistant United States Attorney, in preventing the transcription of grand jury testimony by two prosecution witnesses with the intention of not creating statements producible under the Jencks Act, 18 U.S.C. § 3500, required that the indictment be dismissed or the testimony be struck. Second, tape recordings of conversations between defendant and government informants, not sealed in accordance with 18 U.S.C. § 2518(8)(a), should not have been admitted in evidence. Third, prejudicial variance between the indictment and proof resulted from admission of evidence concerning multiple conspiracies when only a single conspiracy was charged. Each of the issues raised is without merit. The conviction is affirmed.

Testifying in his own behalf, Head admitted that he had knowingly conspired with Loren "Doc" Radford to acquire boats belonging to Daniel Wagner and Keith Heuer for use in smuggling marijuana into the United States. After Head had arranged for the use of Wagner's boat, it struck a reef and sank before the smuggling plan could be put into operation. Head thereupon made arrangements with Heuer to use Heuer's boat as a replacement. Head admitted he was present, along with Wagner, when Radford and Radford's companion, Charlie Moore, were introduced to Heuer and the rental price was agreed upon. Head testified that he was accommodating

Kirk N. Kirkconnell, Alan C. Todd, Steven G. Horneffer, Winter Park, Fla., for defendant-appellant.

Radford with the expectation Radford would favor him with real estate and construction business and that he knew no details of the marijuana smuggling venture.

Subsequent to the Head-Wagner-Heuer-Radford-Moore conversation, Moore and another person returned to Heuer's boat, paid the agreed rental price, and took the boat on a marijuana smuggling venture. They were caught. When Heuer confronted Head with this information, Head admits he assured Heuer that "after the smoke settled down . . . the operation would get going again," that "the top boys are clean, have never been arrested," and that "Charlie Moore [who had been caught] . . . was just a small cog in a wheel." Head also testified that he made up the statement about Charlie Moore and that he did not in fact know Moore's role in the conspiracy.

Unknown, of course, to the conspirators, Wagner had contacted the government when first approached by Head and had agreed to cooperate in revealing the criminal endeavor. From the outset of his involvement, Heuer also agreed to the same sort of cooperation. Wagner and Heuer tape recorded many conversations held with Head and the other conspirators. These recordings were received in evidence and played to the jury after being authenticated by Wagner and Heuer.

In seeking Head's indictment by the grand jury, the prosecutor presented seven witnesses. A court reporter was present and made transcripts of the testimony of four of the persons who testified, the defendant and his three supporting witnesses. At the prosecutor's request, no transcription was made by the court reporter of the testimony by the government case agent or by Wagner or Heuer. At the time of trial, defendant moved to bar the testimony of Wagner and Heuer and in support of his motion called to the stand the Assistant United States Attorney who presented the case to the grand jury. These were the pertinent portions of the prosecutor's testimony:

BY [Counsel for defendant]:

Q. Sir, at the time of the Grand Jury session were you aware that material that was not recorded would not be producible?

. . . . .

A. When I had Dan Wagner and Keith Heuer appear I knew at that time there was substantial informant-written statements and debriefings given by Wagner and Heuer to Special Agent Gilreath of the [Florida Department of Criminal Law Enforcement].

I knew at that point there were up to 50 tape recordings. So my reasoning process was that a transcript of their testimony would not be new testimony because they would not under the circumstances be in a position to recant or to change or to fabricate their testimony.

So I saw no reason to in effect create another transcript to go along with all the statements we already had.

. . . . .

Q. Can you answer whether or not [it] was also one of your considerations . . . to not make available under the Jencks Act material that might constitute impeachment information or material used by Mr. Head's attorney for cross-examination.

A. To create additional statements, that is correct. I didn't believe it was necessary to create additional statements at that point.

. . . . .

Q. So you are saying that you deliberately didn't record so you wouldn't create the facts, so, therefore, you couldn't comply with the Court Order at the time of cross-examination.

A. I deliberately did not record for the reasons I have mentioned here.

THE COURT: Well, was one of the reasons that you didn't record to deny the Jencks Act material to the Defendant?

THE WITNESS: Yes.

THE COURT: Okay. I think that is a fair interpretation.

THE WITNESS: As I mentioned there were already, you know, a sufficient number of statements. So, I think it can be argued, yes, I did not want to create any more.

THE COURT: All right.

BY [Counsel for defendant]:

Q. You deliberately selectively recorded certain Grand Jury testimony and not others for the purpose of not creating Jencks Act material.

A. Right. That was part of it.

## THE JENCKS ACT—SELECTIVE RECORDING OF GRAND JURY WITNESSES

Head asserts that the prosecutor's action in recording the grand jury testimony given by him and his supporting witnesses and at the same time not recording the testimony given by the government's key trial witnesses gave it an unfair tactical advantage at trial because the prosecutor had the transcripts for use in examining defense witnesses, but he was denied similar transcripts of what Wagner and Heuer testified. Thus, Head says this conduct prejudiced him and constituted reversible prosecutorial misconduct which should result in dismissal of the indictment returned or the striking of the testimony of the unrecorded witnesses.

Clearly there was no prejudice to the grand jury proceedings. The grand jurors heard and saw the witnesses. Nonrecording could not have affected the validity of the indictment.

In urging that the testimony of Wagner and Heuer be struck, Head cites § 3500(d), which provides:

If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

However, the government did not elect to refuse to deliver statements under court order. Thus, this portion of the statute is not applicable. Rather, as in any case of asserted prosecutorial misconduct, we are called on to weigh the effect of the prosecutor's actions on the defense.

■ The precise issue presented here is novel. Head acknowledges, as he must, that Fed.R.Crim.P. 6(d), which permits recordation of grand jury witness testimony, is not mandatory. We have held that there is no constitutional or statutory requirement that grand jury proceedings be recorded, though at the same time commenting that it was the far better practice for such recordings to be made. *United States v. Rubin*, 559 F.2d 975 (5th Cir. 1977). We have also rejected a claim that the government is bound to call its best available witnesses to testify before the grand jury, so that their testimony could be recorded and become Jencks Act statements which would be available to the defense. *United States v. Cruz*, 478 F.2d 408 (5 Cir. 1973). In *Cruz* we stated, "no part of the Jencks Act has ever been construed to require the government to *develop* potential Jencks Act statements so that such materials can be combed in the hopes of obtaining impeaching inconsistencies." (Emphasis in original.) 478 F.2d at 411. Here, however, the converse of *Cruz* is presented. The government was unwilling to rely on hearsay witnesses before the grand jury. The informant witnesses did appear and did testify at a time when a court reporter was readily available. In fact, the reporter was told by the prosecutor to stop the transcription at the point these witnesses testified. Analytically, the situation is more comparable to one in which a prosecutor who possesses several Jencks Act statements by a single witness destroys one of the statements while retaining and delivering to the defense those that remain. While such action would be wrong even though the prosecutor believed the statement destroyed was duplicated in what remained, it would not constitute miscon-

duct which would abort the prosecution or bar jury access to the witness's testimony in the absence of some indication of particularized prejudice. *United States v. Clemones*, 577 F.2d 1247 (5th Cir. 1978). *See also United States v. DeSimone*, 452 F.2d 554 (5th Cir. 1971).

■ The purpose of the Jencks Act is to reinforce the credibility of the criminal justice process by requiring the prosecution to furnish the statements of any witness it calls so that the defense can conduct its cross-examination in light of all facts known to the prosecutor and so that the defense is assured that the witness has made no secret contrary statements in the past. Neither of these goals were thwarted in the instant case. The informant witnesses whose testimony was received at the trial had participated in numerous tape recorded conversations with the defendant. Since the shortest recording surpasses the longest memory, these tapes provided the best available evidence of the vital conversations that transpired between the participants in these events. Not only did the witnesses merely recount the events leading to the recordings, but the defendant and the jury also heard the tapes and knew the witnesses' accounts were consistent with them. Moreover, defendant was additionally furnished with copies of written statements made by both witnesses.

The situation is similar to that we faced en banc in the habeas corpus proceeding, *Calley v. Callaway*, 519 F.2d 184 (5th Cir. 1975), when a congressional committee turned over the names of witnesses that it had examined in executive session but refused to provide the court with a transcript of their testimony. However, the defense was furnished with copies of other statements for each of the witnesses named. Without reaching a similar Jencks Act issue raised there, we held that the non-disclosure did not deprive Calley of due process. We required that Calley establish some indication that disclosure would have enabled him to significantly alter the quantum of proof in his favor. To find error in the trial court's refusal to bar the witnesses' testi-mony in Head's case required an indication that the testimony of Wagner and Heuer before the grand jury differed in some significant respect from their testimony at trial. Since the witnesses were so completely cabined by their disclosed tapes and other statements and since these disclosures were completely consistent with their testimony and totally incriminating of Head, he has not even come close to making such a showing. Indeed, his own testimony does not take issue with any portion of the testimony of either of the witnesses he sought to bar.

■ In sum, we hold the prosecutor should not have selectively recorded the testimony of grand jury witnesses, but that defendant has wholly failed to show this mistake amounted to a prosecutorial misconduct warranting dismissal of the indictment or a bar of the use of the testimony of the witnesses whose testimony was not recorded. To create such misconduct a defendant must offer some indication that the prosecutor's action prejudiced him in making his defense, which this defendant failed to do. In the absence of such a showing, the trial court was not in error in refusing to bar the testimony of the witnesses.

## SUPPRESSION OF NONSEALED TAPE RECORDINGS

■ Defendant asserts that the court erred in refusing to suppress the tape recordings made by Wagner and Heuer because they were not "sealed" in accordance with the provisions of 18 U.S.C. § 2518(8)(a). Section 2518 governs the procedures to be used where applications are made for court orders authorizing the interception of wire or oral communications. It outlines the form of the application to be made to the court, the type of order to be entered by the judge authorizing the intercept, and in subsection (8)(a) provides in pertinent part:

The contents of any wire or oral communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. The recording of the

contents of any wire or oral communication under this subsection shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. . . . The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire or oral communication or evidence derived therefrom.

It is obvious from a reading of subsection (8)(a) in context that it does not apply to consensual recordings not made pursuant to court order. In such situations where no judicial order is involved, there is no identifiable judge to direct the sealing. Furthermore, 18 U.S.C. § 2511(d) exempts from the operation of the entire chapter, of which section 2518 is a part, consensual recordings such as made here. Defendant's contention is frivolous. The conditions for admissibility are those provided by the Federal Rules of Evidence—relevancy under Rule 401 and authentication under Rule 901. Both were well satisfied here.

### PREJUDICIAL VARIANCE

Head's final assertion is that the proof was at fatal variance with the indictment. He asserts one conspiracy was alleged, yet three were proven. Despite his own testimony that he knew practically nothing about the manner in which the smuggling of marijuana was to take place, and despite the fact that he admits having introduced Charlie Moore to Heuer, he contends that "his" conspiracy was one in which Doc Raford would use the boats he rented to offload large quantities—several tons—of marijuana from vessels lying offshore. Based upon this contention, he asserts that Moore's action in using Heuer's boat to go to the Berry Islands and pick up a "small" shipment of 250 pounds of marijuana was a separate venture having nothing to do with the conspiracy with which he was charged. He specifically urges that the government's use of the physical evidence seized from Moore was damaging to his case in that it let the jury see actual marijuana. Head also asserts that the portions of the tape recording implicating him in an attempt to continue a smuggling conspiracy even after Moore's arrest shows still a separate conspiracy to obstruct justice by attempting to cover up what happened. We reject both of these contentions.

■ The government set about to prove that Head knowingly entered into a conspiracy which had the goal of illegally importing marijuana into the United States and that Head took the overt act of introducing his co-conspirators Moore and Radford to Heuer so that Heuer's boat could be used to make the illegal importation. It was completely appropriate to the indictment returned for the government to establish that Moore used Heuer's boat to accomplish this exact purpose. It is altogether inconsistent for Head to testify that he had no knowledge as to what type of smuggling Radford contemplated and to insist it was only a "big load" deal. It was similarly appropriate for the government further to demonstrate that even after Moore had been caught, Head continued to insist that the same conspiracy would recover from this setback and would continue to pursue its original illegal aim.

AFFIRMED.