565 So.2d 1311 (1990)
Joey Burton THOMPSON, Appellant,
v.
STATE of Florida, Appellee.
No. 73300.
Supreme Court of Florida.
June 14, 1990.
Rehearing Denied July 12, 1990.
*1312 Wm. J. Sheppard, Elizabeth L. White, Cyra C. O'Daniel and Matthew P. Farmer of Sheppard and White, P.A., Jacksonville, for appellant.
Robert A. Butterworth, Atty. Gen., and Bradley R. Bischoff, Asst. Atty. Gen., Tallahassee, for appellee.
BARKETT, Justice.
Joey Burton Thompson ("Thompson") appeals his conviction of first-degree murder and sentence of death. We affirm the conviction but vacate the sentence of death and remand for imposition of a sentence of life imprisonment.[1]
Evidence presented at trial showed that Thompson and his wife, Janice, were living together in Jacksonville, Florida, in early 1988 when Thompson began having an affair with the victim, Annette Louise Place. Janice learned of the affair and moved out with the couple's two children. On the morning of February 11, Janice asked the police to accompany her to the Thompson home so that she could retrieve clothing that she had left there. She and two officers went to the home and knocked on the door. After about five minutes, Thompson came to the door and appeared to be dazed. Janice pushed Thompson aside and entered. Thompson told the officers that his girlfriend was in the bedroom, dead. The officers found Place's body in the bed, covered by a comforter. She had been shot once in the back of the head and stabbed once in the back. Either wound was fatal.
Oral and written statements, which Thompson had made to police both at the scene and later in jail, were introduced into evidence. Thompson told police that he and Place had an argument on the night of February 9 because Thompson decided to go back to his wife. Place objected and *1313 threatened to blow up the house. When Thompson awoke on the morning of February 10, he decided to kill Place and commit suicide. He said he shot Place as she lay sleeping, then he stabbed her because she was still moving and he wanted her to feel no pain. Thompson wrote a suicide note to his wife, which police found at the scene. He told police that he tried to shoot himself, but when he could not, he slashed at his wrists with a razor blade. However, he could not go through with it. He later indicated to police that he wanted to die, and he asked one officer to shoot him to death.
Thompson testified at trial and contradicted his prior account of the murder, saying that his wife Janice killed Place in a fit of jealous rage. He said he wanted to kill himself to protect his wife and children, and because it would be "better all the way around, it would be easier for me to deal with it." He said he attempted suicide with the gun, by taking an overdose of pills, and finally with a razor blade, each time to no avail. Because he could not kill himself, he said, he confessed in the belief that the state's death penalty would do the job for him.
The jury voted to convict Thompson of first-degree murder, and the trial court followed the jury's recommendation to sentence Thompson to death.

I. GUILT PHASE
Thompson made three claims regarding the grand jury proceedings, two of which merit brief discussion.[2] First, he contends that the trial court erred by denying his pretrial request to record the grand jury proceedings. Sections 905.17 and 905.27 of the Florida Statutes (1987), do not establish a duty to record grand jury proceedings, nor do we find any constitutional basis to impose such a duty in all cases. In re Report of the Grand Jury, 533 So.2d 873, 875 (Fla. 1st DCA 1988); accord United States v. Head, 586 F.2d 508 (5th Cir.1978). Although recordation may be the best and most desirable practice, e.g., State v. McArthur, 296 So.2d 97, 100 (Fla. 4th DCA), cert. denied, 306 So.2d 123 (Fla. 1974); United States v. Head, 586 F.2d at 511, that choice generally is one for the legislature. We agree with McArthur that the interests of justice may require trial courts to order recordation in some instances. McArthur, 296 So.2d at 100. However, no showing was made to establish that Thompson had a particular need to preserve grand jury testimony through recording. Under these circumstances, the trial court did not abuse its discretion by denying the motion.
We also know of no statutory or constitutional authority to support Thompson's second contention, that the state should be precluded from conducting voir dire of prospective grand jurors. Implicit in the statutory right to challenge individual prospective grand jurors, section 905.04, Florida Statutes (1987), is the opportunity to obtain information from them about their qualifications. We have been presented with no argument to show why that should not be done through voir dire. Certainly, Thompson has a right to fair treatment by a lawfully composed grand jury. However, he did not present us with the record of the voir dire, nor did he present any evidence to show that his rights were jeopardized by the voir dire. This claim has no merit.
Thompson also raises two issues regarding petit jury selection, one of which merits discussion here.[3] He claims that he *1314 was denied fair treatment when the state was allowed to use background information on the criminal arrest records of prospective jurors, while denying Thompson the same information or the funds to acquire that information. He argues that it gave the state an unfair advantage and enhanced the danger of jury bias in the state's favor.
Thompson alleges that the state gets such information as a routine matter, and that it routinely denies defense attorneys access to that information. But the record does not make clear whether the state did in fact possess any information about the prospective jurors. The record also fails to establish whether Thompson could have obtained access to that information through his own resources, or whether it was information to which only the state reasonably or lawfully had access. We empathize with Thompson's concerns for fairness, but the record here is insufficiently developed for us to determine that he was denied fair treatment.
We agree with Thompson's next claim, that the trial court erred when it allowed Place's father to identify his deceased daughter from a photograph. However, we find the error harmless beyond a reasonable doubt in this case. Courts of this state have followed a long-standing rule that relatives may not be called solely to identify their deceased victims when unrelated, credible witnesses are available to make an identification. The rule is based on the theory that the testimony of relatives is likely to be inflammatory and may arouse unwarranted jury sympathy for the victim, interjecting matters not germane to the issue of guilt or punishment. See, e.g., Dougan v. State, 470 So.2d 697 (Fla. 1985), cert. denied, 475 U.S. 1098, 106 S.Ct. 1499, 89 L.Ed.2d 900 (1986); Welty v. State, 402 So.2d 1159 (Fla. 1981); Lewis v. State, 377 So.2d 640 (Fla. 1979); Rowe v. State, 120 Fla. 649, 163 So. 22 (1935). When the state intends to offer such evidence, it must show that it made an effort to find witnesses other than relatives to identify the victim. The family member should be a witness of last resort.
The state argues that it knew of only one witness  the father  who could identify the body from the photograph. The state says it had a nonrelative witness available who had known Place, but that the witness was unable to identify Place from the postmortem photograph. Thompson's argument, that the state could have sought other witnesses, is well taken. There is no evidence in the record that the state made a concerted effort to find other competent witnesses to identify Place.
The record shows that the trial judge was concerned enough to have the state assure that it would not ask the witness to disclose his relationship to the victim. However, the court's precautions proved to be insufficient, as the following colloquy discloses:
Q [by the state] Sir, I now show you State's Exhibit A and I ask you to look at the photograph that's been marked for identification and ask you if you recognize that photograph?
A Yes, I do.
Q And what is that a photograph of; is that Annette Louise Place?
A That's my daughter, Annette Louise Place.
The trial judge immediately recognized the error and considered ordering a mistrial. However, after reviewing the law, the judge ruled that the error was harmless because the witness displayed no emotional outburst or other unduly prejudicial behavior to improperly influence the jury. Upon this record, we concur with the trial judge and find the error harmless beyond a reasonable doubt. Dougan, 470 So.2d at 699; Welty, 402 So.2d at 1162.
Thompson next claims that the trial court should not have permitted the jury to see highly prejudicial photographs of the victim. The law is clear that the trial court has discretion, absent abuse, to admit photographic evidence so long as the evidence is relevant. E.g., Patterson v. *1315 State, 513 So.2d 1257, 1260 (Fla. 1987); Wilson v. State, 436 So.2d 908, 910 (Fla. 1983); Welty, 402 So.2d at 1163; see §§ 90.401-.403, Fla. Stat. (1987). The photographs here were relevant to establish the victim's identity and to show that Thompson's out-of-court confessions were consistent with the physical evidence found at the scene. The gruesome nature of the homicide photographs here does not render the decision to admit them into evidence an abuse of discretion.
Finally, Thompson claims that the trial court erroneously allowed Janice Thompson to testify as a rebuttal witness for the state after she deliberately hid from the defense prior to trial, allegedly with the state's acquiescence.
The record discloses the following facts. Thompson tried to depose Janice in September 1988, weeks before the trial. The state disclosed to Thompson all of Janice's addresses that it had, and the defense attempted to serve Janice with deposition subpoenas. However, the subpoenas were not served because Janice had fled the area to hide from Thompson and his family. The state told Thompson that it believed Janice to be somewhere in Georgia.
Janice learned through a friend that the defense wanted to depose her, so she called the state attorney's office for advice. "She wanted to know whether she had to appear or not," the prosecutor told the trial court, "and I said that's up to her. I did tell her that they have a right to question you and you have a right to appear."
When the trial began a few weeks later, the defense disclosed in its opening statement on Tuesday morning, October 4, that Janice would be blamed for the murder. The state then sent an investigator to locate Janice. The investigator contacted Judy Crum, a friend known to receive occasional telephone calls from Janice. The investigator testified that he asked Crum to tell Janice to contact the state attorney's office because Janice had just been accused of murder.
At some time between 3 p.m. and 4 p.m. that day, Crum called the state attorney's investigator and said that Janice would be willing to speak with the state. Crum gave the investigator Janice's telephone number. The investigator called Janice, and at about 5:30 p.m., he made arrangements to fly her to Jacksonville.
At almost the very same moment that afternoon, Thompson took the stand and testified on direct examination that Janice had committed the murder. Thompson completed his direct testimony at about 6:30 p.m. Janice arrived in Jacksonville around 9:45 p.m.
The state brought Janice to the state attorney's office at 8 a.m. Wednesday, October 5, and interviewed her about the case. The trial reconvened at 10:30 a.m., whereupon the state cross-examined Thompson, and the defense conducted its redirect examination. Only then did the state disclose to Thompson that it had located Janice and that she would testify for the prosecution as a rebuttal witness.
Thompson moved to prohibit her testimony, contending that the state failed to comply with the continuing obligation of discovery provided by Florida Rule of Criminal Procedure 3.220. The trial court conducted a hearing pursuant to Richardson v. State, 246 So.2d 771 (Fla. 1971), and ruled that Janice could testify because the state's actions were neither wilful, substantial, nor prejudicial. The court then gave Thompson a little more than an hour to take a deposition from Janice before she testified that afternoon.
We see two issues presented by these facts. First, we agree with the trial court that the state complied with rule 3.220 before the trial began. Even though the prosecutor's advice to Janice about the September deposition might have diminished the witness's moral sense of duty to testify, and may not have served the interest of finding the truth, the state had no legal obligation to advise Janice to testify at the deposition because Janice had no legal duty to answer a subpoena that had not been properly served. See § 48.031, Fla. Stat. (1987). While we might disagree with the procedure employed by the state, we do not find error here.
*1316 However, we are more troubled by the state's failure to disclose Janice's whereabouts in the hours before the state cross-examined Thompson. The state knew that Janice had become central to the defense's case, and that Thompson was keenly interested in what Janice had to say.[4] Discovery regarding rebuttal witnesses is compelled by rule 3.220, Kilpatrick v. State, 376 So.2d 386, 388 (Fla. 1979); see also Smith v. State, 500 So.2d 125, 127 (Fla. 1986), and there is a continuing obligation under rule 3.220(f) to "promptly disclose or produce such witnesses" who fall within the rule. In Cooper v. State, 336 So.2d 1133, 1138 (Fla. 1976), cert. denied, 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 239 (1977), we observed that prompt disclosure means "immediate disclosure" where "a complex trial involving a human's life was scheduled to begin in one week." That "immediate disclosure" requirement is all the more compelling when, as here, the trial is underway and the defendant is about to be subjected to cross-examination. The trial court below recognized that the violation required a Richardson hearing and concluded that it was not necessary to exclude Janice's testimony as a rebuttal witness. We agree with the trial court's result, but we disagree with its analysis.
The trial court found:
One, whether the violation was inadvertent or wilful, the State has presented me with testimony before we adjourned for lunch that they gave you the only address that they had which they went through; that they did not know of her whereabouts; did not know how to reach her and provided you with the only address that they had. It would appear that until your opening statement on Monday afternoon, excuse me, Tuesday morning that Mrs. Thompson was an insignificant witness until after your opening statement when the State expressed surprise and expressed that. As to the defense, I cannot under any stretch of my imagination see where her coming here today would hamper in any way your ability to prepare for trial being as the defense in this case was that Mrs. Thompson had done this as opposed to Mr. Thompson. So, I don't find that the violation is willful, that they were substantial, or had in any way affected your ability to prepare for trial.
First, as to wilfulness, the trial court focused upon the state's actions before the trial  not the state's action during the trial. Clearly the state acted wilfully when it chose not to disclose the fact that Janice had been in town since 9:45 p.m. the night before, that Janice had been in the state's offices all morning, and that the state had interviewed her in preparation for Thompson's cross-examination. The only reasonable conclusion possible is that the state acted wilfully to gain a tactical advantage.
As to the substantiality of Janice's role, it is obvious that Janice was a substantial figure in the case, considering that Thompson's defense rested solely upon his accusation of her. She had the potential of being far more than a trivial witness. Richardson, 246 So.2d at 775.
As to prejudice, the inquiry must focus on whether there was procedural rather than substantive prejudice. Wilcox v. State, 367 So.2d 1020, 1023 (Fla. 1979). That inquiry involves two aspects. First, courts must determine whether the violation impaired the defendant's ability to prepare for trial. Id. In this instance, the violation impaired the defense's ability to prepare for Thompson's cross-examination and redirect examination, Janice's examination, and any efforts Thompson might have made to find evidence to impeach or rebut what Thompson expected Janice to say. See Smith v. State, 500 So.2d 125, 127 (Fla. 1986) (the Richardson rule applies to rebuttal and impeachment evidence as well as direct evidence); Wilcox, 367 So.2d at 1023 (prejudice could result if discovery *1317 violation deprives defendant time to gather rebuttal evidence).
"Once it has been ascertained whether the discovery violation hindered the defendant in his preparation for trial, the court must consider the nature of the violation in fixing upon a sanction. Prejudice may be averted through the simple expedient of a recess to permit the questioning or deposition" of a witness. Wilcox, 367 So.2d at 1023 (footnote omitted). Here, the trial court allowed Thompson to depose Janice before she testified. Under the facts of this case, we find that the trial court succeeded in averting the prejudice.
Had the discovery violation occurred before Thompson presented his opening statement and direct examination, we might easily reach a different conclusion. But the violation occurred after Thompson fully committed himself to the strategy of blaming his wife for the murder. The prejudice to Thompson under these circumstances must focus on his ability to prepare for his own cross-examination and redirect examination, and the examination and possible rebuttal of Janice. Thompson's cross-examination and redirect examination necessarily were limited to the scope of his direct testimony, so there could have been no substantial prejudice in that regard. The deposition substantially cured Thompson's inability to prepare to cross-examine Janice and rebut her testimony. We find no reversible error.
There is sufficient competent evidence in the record to support the jury's verdict. Having found no reversible error in the guilt phase, we affirm the conviction for first-degree murder.

II. PENALTY PHASE
In the penalty phase, the jury voted eight to four to recommend the sentence of death. The trial court found one aggravating circumstance: the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.[5] The trial court also found five mitigating circumstances, including one statutory and four nonstatutory circumstances: (1) Thompson had no significant history of prior criminal activity;[6] (2) Thompson had been separated from his wife and considered suicide after the murder, thereby showing that he may have been suffering from emotional stress; (3) Thompson maintained employment during his two marriages to his wife; (4) at the time of the murder Thompson had lost touch with his family, but when he was a teenager in school he was a considerate son; and (5) Thompson had been a good inmate while in custody.
On those written findings, the trial court concluded that "the mitigating circumstances in this case, although greater in number than the aggravating factor found in this case[,] do not outweigh the cold, calculated, and premeditated manner in which this Defendant's crime was committed. The Defendant's subsequent defense of blaming his wife, the mother of his two young children[,] coupled with the execution style killing of the defenseless victim[,] justifies the death sentence."[7]
Thompson challenges the court's finding that the aggravating circumstance of cold, calculated, and premeditated murder, is supported by the facts in this case. We agree with Thompson. Many times this Court has said that section 921.141(5)(i) of the Florida Statutes (1987), requires proof beyond a reasonable doubt of "heightened premeditation." We adopted the phrase to distinguish this aggravating circumstance from the premeditation element of first-degree murder. See, e.g., Hamblen v. State, 527 So.2d 800, 805 (Fla. 1988); Rogers v. State, 511 So.2d 526, 533 *1318 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). Heightened premeditation can be demonstrated by the manner of the killing, but the evidence must prove beyond a reasonable doubt that the defendant planned or prearranged to commit murder before the crime began. Hamblen, 527 So.2d at 805; Rogers, 511 So.2d at 533. See, e.g., Koon v. State, 513 So.2d 1253 (Fla. 1987), cert. denied, 485 U.S. 943, 108 S.Ct. 1124, 99 L.Ed.2d 284 (1988).
The state relies heavily on the fact that Thompson awoke at 8 a.m. and killed the victim at 8:30 a.m., arguing that Thompson had thirty minutes to think about what he was doing before he killed Place. But there is no evidence in the record to show that Thompson contemplated the killing for those thirty minutes. To the contrary, the evidence indicates that Thompson's mental state was highly emotional rather than contemplative or reflective. It is an equally reasonable hypothesis that Thompson hit his breaking point close to 8:30 a.m., reached for his gun and knife, and killed Place instantly in a deranged fit of rage. "Rage is inconsistent with the premeditated intent to kill someone," unless there is other evidence to prove heightened premeditation beyond a reasonable doubt. Mitchell v. State, 527 So.2d 179, 182 (Fla.), cert. denied, 488 U.S. 960, 109 S.Ct. 404, 102 L.Ed.2d 392 (1988). Thus, the evidence does not support beyond a reasonable doubt a finding that this aggravating circumstance exists.
Because no valid aggravating circumstances exist, the death sentence cannot stand and we find no need to discuss other points raised on appeal. Accordingly, we affirm Thompson's conviction, vacate the sentence of death, and remand this cause to the trial court for imposition of the sentence of life imprisonment.
It is so ordered.
McDONALD, SHAW and KOGAN, JJ., concur.
EHRLICH, C.J., concurs in result only with an opinion, in which OVERTON and GRIMES, JJ., concur.
EHRLICH, Chief Justice, concurring in result only.
I do not share the Court's being "troubled by the state's failure to disclose Janice's whereabouts in the hours before the state cross-examined Thompson," considering the turn the case took when the defense disclosed for the first time in its opening statement that it was contending that Janice was the murderer and not the defendant. From that moment, Janice became a most critical witness. It was imperative that the state talk with her in light of this extraordinary new development. The state properly pulled out all stops to locate her and bring her to the trial and she arrived in Jacksonville around 9:45 p.m., a point in time after defendant had completed his direct examination, wherein he had accused Janice of being the murderer. The state interviewed Janice the following morning but did not disclose her presence in Jacksonville until it had completed its cross-examination of the defendant and the defense had conducted its redirect examination.
The Court seems to feel that the state should have apprised the defendant of Janice's presence in Jacksonville earlier than it did. I do not agree, keeping in mind that the defendant had already testified and pointed the accusing finger at her. Once having so testified, the course of the defense was irrevocably set.
The Court finds no reversible error in what the state did after Janice arrived in Jacksonville. I find no error. I believe that rule 3.220 was complied with, when the facts and time sequence of events is fully considered. Janice arrived after defendant had testified on direct and pointed the accusing finger at her. The state apprised the defense of Janice's presence after defendant had completed his testimony. While this may have given the state some advantage, which the Court critically chooses to call a tactical advantage, the state's actions were preeminently proper. To have disclosed her presence earlier would have been poor trial strategy and would not have served the truthfinding process.
*1319 Surely, the state was entitled to talk to Janice first. Seemingly, the Court feels that the defense should have had the opportunity to depose Janice before the state cross-examined defendant. Would this have been of some benefit to the defense while the state was conducting its cross-examination of defendant? No. Would it have been of some advantage to the defendant when it conducted its redirect examination? The answer is also no, when one considers that redirect examination is limited to those matters brought out on cross-examination.
If Janice had arrived in Jacksonville earlier and prior to defendant's having testified, my view may very well be different. We are now dealing with the facts as they were presented to the trial judge and not with some theoretical set of facts.
In short, I think the cause of justice was served by what the state did. The trial judge was preeminently correct in concluding that the state did not act improperly.
OVERTON and GRIMES, JJ., concur.
NOTES
[1] We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
[2] Thompson also contends that the indictment was invalid because it came from an improperly composed grand jury of 23 members, in violation of section 905.01(1) of the Florida Statutes (1987), and in violation of his equal protection right not to be indicted by an improperly composed grand jury. This issue requires no discussion because we expressly resolved the question on the merits against Thompson when we denied the suggestion for a writ of prohibition. Thompson v. Santora, 534 So.2d 402 (Fla. 1988) (reported in a table without the text of the order).
[3] Thompson also alleges that his jury was improperly selected when the trial court removed for cause a prospective juror who said she could not vote to impose the death penalty, although she said she could sit in the guilt phase. This issue has been decided adversely to Thompson in other cases. See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); Herring v. State, 446 So.2d 1049 (Fla.), cert. denied, 469 U.S. 989, 105 S.Ct. 396, 83 L.Ed.2d 330 (1984).
[4] The state knew that Thompson had been trying to locate Janice. Thompson had been trying to set her for deposition; there had been discussions between the defense and prosecutor about Janice's whereabouts; and Thompson filed a motion for a more definite address on September 23, 1988, claiming that, "[i]n order to prepare a defense, it is necessary for Defendant to locate [Janice] to discuss her knowledge of the case."
[5] § 921.141(5)(i), Fla. Stat. (1987).
[6] Id. § 921.141(6)(a).
[7] Because we are reversing the penalty on other grounds, we need not address fully Thompson's argument that the trial court impermissibly relied on nonstatutory aggravating factors. "Florida law prohibits consideration of nonstatutory aggravating circumstances." Barclay v. Florida, 463 U.S. 939, 956, 103 S.Ct. 3418, 3428, 77 L.Ed.2d 1134 (1983). We also note that the trial judge's approval or disapproval of the theory of defense can play no part in a judicial proceeding.