United States Court of Appeals
Fifth Circuit

**F I L E D**

June 8, 2006

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 04-31051
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

NOAH MOORE,

Defendant-Appellant.

-----------------------------
Appeal from the United States District Court
for the Eastern District of Louisiana
-----------------------------

Before HIGGINBOTHAM, DAVIS, and STEWART, Circuit Judges.

PER CURIAM:

I

On September 11, 2003, a Federal Grand Jury indicted Noah Moore on a single count of conspiring to distribute more than 100 grams of heroin. Moore was then serving a sentence for a 1993 federal narcotics conviction.

On January 29, 2004, Moore moved to suppress recordings of his telephone conversations, which had been monitored and recorded by the Bureau of Prisons during his imprisonment and which the government intended to introduce at trial. The district court denied the motion, finding that Moore had consented to being recorded. Moore also moved to dismiss the indictment, alleging

that the government destroyed recordings of exculpatory conversations. The district court denied that motion as well, finding that the allegedly exculpatory information was not material and that the government did not act in bad faith.

At trial, the government offered evidence that in 1993 Moore began serving a 295-month sentence in federal prison for cocaine distribution. Hillary Williams, a resident of New Orleans, began visiting Moore shortly after Moore's incarceration, at which time Moore introduced Williams to a Nigerian inmate, Tunde Ademuiiwa. Moore told Williams that Tunde assisted Moore with his appeal and told Tunde that Williams would help pay for Tunde's legal services.

In New Orleans, Williams began collecting money from Moore's friends, ostensibly to pay for Tunde's legal services. Eventually, Tunde, who had been released from prison and deported to Nigeria, began calling Williams at home, asking for money. Tunde told Williams that Moore owed him $50,000.00. In August 2002, Williams visited Moore in prison. Moore explained that Tunde was a Nigerian heroin dealer, that Moore's mother and sister stole $50,000.00, that Moore owed Tunde for past heroin sales, and that Moore was counting on Williams to help him pay it back. Moore informed Williams that he had ordered more heroin from Tunde and that it would be shipped to Williams hidden inside African art books. Between December 2002 and January 2003, Tunde sent Williams three African art books concealing heroin, and Williams wired $10,000.00

2

to Tunde.  To settle the remainder of the debt, Williams planned to buy more heroin from Tunde and to sell it through his friend "Chris."  Unbeknownst to Williams, "Chris" was a confidential informant for the DEA.  After receiving information from "Chris," the DEA approached Williams about his involvement in the drug conspiracy, and Williams cooperated.  Williams explained the heroin importation scheme, put undercover DEA agents in contact with Tunde and his Nigerian suppliers, and ultimately testified at trial.

In addition to Williams's testimony about the conspiracy, the government introduced recordings of conversations between Moore and Tunde over the prison telephone.  Of 282 tapes, 16 were retained by the government, while the others were recycled.[1]  In these calls, Moore and Tunde, spoke in coded language.  For example, on July 16, 2000, Moore and Tunde spoke about a "pizza" that costs "about two."  They also talked about having to "put together transportation" and having to buy a "Visa."  On December 22, 2000, Tunde told Moore the "dude" wanted Moore to "get somebody, find somebody that I can call that will respond anytime I say call me...because I'm wanting to schedule some things."  Tunde advised Moore that the "dude" wanted payment for "flight tickets" in advance.  Tunde said "in the middle of January we are on.  It's gonna be 50/50 whatever I got...

---

[1]  There were also 78 tapes of recorded phone calls between Moore and Williams, all of which were recycled.  Only these 78 tapes are the subject of the alleged Jencks Act violation (see *infra* issue III), whereas all of the lost tapes, approximately 344, are the subject of the alleged *Brady* violation (see *infra* issue II).

everything's OK it's going to be between two and two-five." In another cryptic call on June 19, 2001, Tunde told Moore "I can only get about 400 tribes right now, OK," but "within the next two weeks I can get about 800." Tunde explained "I gotta go to the...to other countries that have different tribes to so [sic] if we get these clothes from every tribe." On June 12, 2002, Moore told Tunde that he sent a check but "just was able to send two." Moore said, "I will probably have the pictures for you this week...." Tunde responded, "I need those pictures." Moore testified at trial that these conversations were about his post-conviction petitions. Specifically, Moore claimed that he and Tunde were talking about raising $25,000.00 to hire habeas attorney Linda Sheffield, that Moore enlisted friends and family to contribute to the legal fee, and that Moore sent Sheffield's contract to Tunde in Nigeria for Tunde's review. Moore also contended that many of the references were to business deals he and Tunde were planning, such as importing t-shirts and diamonds. The government argued that these calls, and the cryptic references to "clothes," "tribes," "pizza," "flight tickets," and "pictures," were really related to heroin and payments for heroin. Moreover, a convicted felon, involved in a separate plan to import and distribute cocaine, corroborated that he and Moore discussed heroin, using code words like "clothes," "fruit," or "tennis shoes." The government did not dispute that Moore sometimes talked with Tunde and others about his habeas case,

4

but argued that Moore was trying to raise money for a habeas lawyer by selling drugs.

The jury found Moore guilty as charged, and the district court sentenced Moore to a prison term of 200 months, to run consecutive to Moore's 1993 federal sentence, and also to an eight-year term of supervised release.  He appeals on six grounds.


II

Moore argues that the district court erred by denying his motion to suppress telephone conversations recorded by the BOP. In addition to his consent to the recordings, Moore contends that the government must also satisfy a second exception to the Federal Wiretap Act[2]—the tapes must also have been collected in the ordinary course of law enforcement.  We review factual findings of a ruling on a motion to suppress for clear error and legal conclusions *de novo*.[3]

Section 2515 of the FWA prohibits the use as evidence of intercepted communications "if the disclosure of that information would be in violation of this chapter."[4]  The FWA contains numerous

---

[2]  18 U.S.C. §§ 2510-2522.  The FWA is formally known as Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended by the Electronic Communications Privacy Act of 1986 and the Communications Assistance for Law Enforcement Act of 1994.  *See Quigley v. Rosenthal*, 327 F.3d 1044, 1047 n.1 (10th Cir. 2003).

[3]  *See United States v. Hunt*, 253 F.3d 227, 229-230 (5th Cir. 2001).

[4]  18 U.S.C. § 2515.  Section 2515, prohibition of use as evidence of intercepted wire or oral communications, reads, in its entirety:

exceptions to the requirement of court-ordered authorization. The FWA provides that "[i]t shall not be unlawful under this chapter...for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."[5] The FWA also makes an exception for any "electronic, mechanical, or other device...which can be used to intercept a wire, oral, or electronic communication" used "by an investigative or law enforcement officer in the ordinary course of his duties."[6]

Moore argues that the government must satisfy both exceptions—it must have the consent of a party to the conversations and they must have been recorded in the ordinary course of law enforcement. Moore points to provisions in which Congress expressly insulated the government from § 2515's broad prohibition against unlawful disclosure: "Notwithstanding any other law...;"[7]

___

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter [18 USCS §§ 2510 et seq.].

*Id.*

[5]  18 U.S.C. § 2511(2)(c); *see also id.* at (d).

[6]   18 U.S.C. § 2510(5)(a)(iii) (referred to as the "law enforcement" exception).

[7]  18 U.S.C. § 2511(2)(a)(ii).

"Notwithstanding any other provisions of this title...;"[8] and "Nothing contained in this chapter...."[9] Absent this express intention, Moore argues that the government must satisfy both exceptions because neither excludes the applicability of other sections. The district court found that consent alone suffices to support admission. We agree.

The government cites *United States v. Head*, which recognizes the exemption for consensual recordings but does not explicitly address the unnecessary exercise of satisfying additional criteria.[10] The Second, Fourth, Seventh, and Tenth circuits have all expressly or impliedly found one exception sufficient to warrant admissibility.[11] Moore's analysis is strained, and he

---

[8]  18 U.S.C. § 2511(2)(e).

[9]  18 U.S.C. § 2511(2)(f).

[10]  586 F.2d 508, 513 (5th Cir. 1978) ("Furthermore, 18 U.S.C. § 2511(d) exempts from the operation of the entire chapter, of which section 2518 is a part, consensual recordings such as made here.");  *see also United States v. Mendoza*, 574 F.2d 1373, 1377 (5th Cir. 1978) (stating that "18 U.S.C. § 2511(2)(c) provides that such consent renders lawful the interception of a wire or oral communication").

[11]  *In re High Fructose Corn Syrup Antitrust Litig.*, 216 F.3d 621, 625 (7th Cir. 2000) (stating that "[t]o subject interceptions made lawful by sections 2511(2)(c) and (d) to section 2517(3) would have absurd consequences"); *United States v. Hammond*, 286 F.3d 189, 191-192 (4th Cir. 2002) (stating "the tapes were properly used by the FBI only if (1) the initial interception by the BOP was lawful pursuant to *an exception* to the general injunction prohibiting use of wiretaps," thus proceeding to analyze the issue as if any exception would suffice (emphasis added)); *Unites States v. Amen*, 831 F.2d 373, 378 n.1 (2d Cir. 1987) (affirming the district court's ruling on alternative grounds—consent—while casting doubt on the applicability of the law enforcement exception on which the trial court relied); *United States v. Horr*, 963 F.2d 1124, 1126 (10th Cir. 1992) (explicitly relying on the consent exception to affirm the district court which instead relied on the law enforcement exception).

7

unpersuasively relies on an inapposite Ninth Circuit decision.[12] We are persuaded that the disputed provisions of the FWA are each exceptions under which the recorded material may be admitted. In short, consent alone suffices to admit Moore's recorded conversations, and he does not contest that he consented to the recording.[13] The district court did not err by denying Moore's motion to suppress the tapes.

## III

Moore reasserts a violation of *Brady v. Maryland*[14], pointing to the government's failure to preserve 344 tape recordings of conversations between himself and Williams or Tunde.[15] We review *de novo* claims of *Brady* violations.[16]

*Brady* requires the government to disclose to criminal

---

[12] *United States v. Van Poyck,* 77 F.3d 285 (9th Cir. 1996) (finding both exceptions applicable and, therefore, not deciding if one would suffice).

[13] As the district court found, the BOP sufficiently notified Moore that all of his phone calls were subject to surveillance and recording. The following warning is posted at all prison phones: "Notice: The bureau of Prisons to Inmates. Telephone Regulations. All conversations on this phone are subject to monitoring. Your use of this telephone constitutes consent to this monitoring. You must contact the unit team to request an unmonitored attorney call."

[14] 373 U.S. 83 (1963).

[15] The government possessed the tapes, though they were housed at the BOP, since the BOP acted as its investigatory agent. *See United States v. Ramirez*, 174 F.3d 584, 588 (5th Cir. 1999) ("There is no doubt that the Bureau of Prisons was part of the investigative team regarding this transaction. The tapes were in the possession of the Bureau of Prisons until they were taped over, and therefore they were in the 'possession of the United States'....")."

[16] *United States v. Green*, 46 F.3d 461, 464 (5th Cir. 1995).

defendants favorable evidence, material to guilt or punishment.[17] Materiality requires "an exculpatory value that was apparent before the evidence was destroyed" and that was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."[18] Moreover, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."[19] Absent a showing of bad faith, failure to preserve potentially useful evidence does not constitute a denial of due process.[20] In sum, impermissibly withheld evidence must be either (1) material and exculpatory or (2) only potentially useful, in combination with a showing of bad faith on the part of the government.[21] The district court appropriately denied Moore's motion to dismiss on two grounds, failure to show that the lost evidence was exculpatory and failure to establish bad faith. On appeal, Moore does not describe a single exculpatory fact that might have emerged from the lost tapes, despite participating in each recorded conversation.

---

[17] *Brady*, 373 U.S. 83; *United States v. Agurs*, 427 U.S. 97 (1976).

[18] *California v. Trombetta*, 467 U.S. 479, 489 (1984).

[19] *United States v. Bagley*, 473 U.S. 667, 682 (1985).

[20] *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988) (The government tested the cocaine four times prior to its destruction—each test confirming the substance as cocaine.).

[21] *Illinois v. Fisher*, 540 U.S. 544 (2004).

9

Rather, Moore generally argues that the necessary showing of materiality need not be overly burdensome.[22] He then relies on conclusory allegations in order to construct a constitutional deprivation—the inability to contextualize the government's excerpts, the inability to effectively cross-examine the government's witness, and the need to avoid a perception of malfeasance.[23] These vague assertions do not establish any exculpatory evidence, let alone a reasonable probability that such evidence affected the outcome of the trial.[24]

[22]

First, materiality does not require the defendant to demonstrate by a preponderance of the evidence that omitted evidence would have resulted in acquittal. Second, he need not weigh the withheld evidence against the disclosed evidence to show he would have been acquitted by the resulting totality. Third, if evidence is found material, there is no need to conduct a harmless error analysis. Fourth, the withheld evidence should be considered as a whole, not item-by-item. The sum of these four guideposts means that to show a due process violation when the state withholds evidence, a defendant need not prove that his trial necessarily would have had a different outcome; a lack of faith in the result is sufficient.

*DiLosa v. Cain*, 279 F.3d 259, 263 (5th Cir. 2002) (internal citation omitted).

[23]  "It is a troubling prospect if government officials can routinely destroy drugs, then argue that the drugs had no exculpatory value because the government officials 'knew' that the drugs were indeed drugs." *United States v. Belcher*, 762 F.Supp. 666, 672 (W.D.Va. 1991) ("*Belcher I*") (finding a constitutional violation involving material exculpatory evidence where no one had ever tested the plant in order to determine if it was in fact marijuana before its destruction); *United States v. Belcher*, 769 F.Supp. 201 (W.D.Va. 1991) ("*Belcher II*").  The tapes were recycled prior to any knowledge that they would be used to prosecute Moore.

[24]  At trial, Moore submitted two allegedly exculpatory uses for the tapes. The district court concluded that Moore's "own description of the claimed evidence would prove only uncontested facts." First, Moore claimed calls existed which would reveal that he had not spoken to Williams in more than a year; Williams testified to this very fact.  Second, Moore contends that the government, which argued that he often used his habeas petition as code to conduct the conspiracy, deprived him of conversations detailing his legitimate efforts to file a habeas petition, yet Moore's attorney testified about his

10

Moore also fails to successfully traverse the second avenue for demonstrating a *Brady* violation. With respect to potentially useful evidence, the lost tapes parallel the cocaine in *Youngblood*,[25] which was destroyed pursuant to standard procedure and, thus, did not constitute a constitutional violation. Similarly, the BOP recycled all of the tapes after 180 days, as per the BOP's policy.[26] As such, the BOP did not destroy the tapes in bad faith. Moore's argument that bad faith can be inferred from the fact that only excerpts containing inculpatory evidence survived and that retaining all of the tapes would not have been unduly burdensome altogether fails to prove bad faith. The district court did not err in concluding that Moore failed to demonstrate any material exculpatory evidence contained on the recycled tapes and failed to demonstrate that the government acted in bad faith in destroying potentially exculpatory evidence.

IV

Moore reasserts that the government's failure to provide the recordings of 78 conversations between himself and Williams

efforts to file a habeas petition. Therefore, these reasons fail to establish a reasonable probability that the outcome would have differed because Moore presented this evidence by alternative means.

[25] *See Youngblood*, 488 U.S. 51.

[26] The district court found that Moore failed to establish that the recordings were destroyed for a reason "other than pursuant to the Bureau of Prisons' regular and routine procedures."

11

violated the Jencks Act,[27] which requires the government to produce any "statements made by a witness concerning the subject matter on which the witness has testified that are in the possession of the government after the witness testified on direct examination in a criminal trial...."[28] "The definition of 'statement[s]' includes 'a...recording...which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement.'"[29]

Jencks Act sanctions should be imposed in cases of bad faith and negligent suppression of evidence but not in the case of good faith loss by the government.[30] This Court has instructed the district courts to "weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial in order to come to a determination that will serve the ends of justice."[31] Even when a violation exists, we apply harmless-error analysis.[32] "The clearly erroneous standard

---

[27] The government did not preserve any of the 78 recordings of telephone conversations between the government witness and Moore.

[28] 18 U.S.C. § 3500(b); FED.R.CRIM.P. 26.2.

[29] *Ramirez*, 174 F.3d at 587 (quoting 18 U.S.C. § 3500).

[30] *Id.* at 589.

[31] *Id.*

[32] *Id.* at 587 (citing *United States v. Martinez*, 151 F.3d 384, 391 (5th Cir. 1998)). "In the context of the Jencks Act, we must strictly apply the harmless error analysis review and determine whether the error itself had a substantial influence on the judgment in addition to determining whether there was sufficient evidence to support the conviction." *Id.* (citing *United States v. Keller*, 14 F.3d 1051, 1054-55 (5th Cir. 1994)).

of review applies to district court determinations of what material must be produced under the Jencks Act."[33]

As discussed *supra* III, the district court did not err in finding an absence of bad faith. Similarly, the BOP's actions did not amount to negligence, as the tapes were recycled pursuant to policy before the DEA began to investigate Moore.[34] Moreover, Moore has not identified any useful information in the conversations, despite having participated in each. The district court did not clearly err in denying relief, pursuant to the Jencks Act.

V

Moore contends that the district court erred by admitting evidence concerning a heroin transaction, in which Moore was not involved and which occurred outside the scope and time-frame of the charged conspiracy. We review a district court's evidentiary rulings for abuse of discretion[35] and are persuaded that the district court did not abuse its discretion in allowing the government to offer corroborative evidence of a heroin sale from a source in Africa in order to support a witness' challenged

---

[33] *United States v. Cathey*, 591 F.2d 268, 274 (5th Cir. 1979).

[34] *But cf. Ramirez*, 174 F.3d at 589 ("We also find unpersuasive the government's arguments that it is excused because the tapes containing the lost calls were destroyed before Mrs. Ramirez's indictment. Even so, the tapes were certainly available during the investigation of Ramirez therefore allowing the government to preserve only the conversations it believed were favorable to the prosecution.").

[35] *United States v. Wilson*, 322 F.3d 353, 359 (5th Cir. 2003).

13

testimony that he had knowingly accepted heroin from that source.

On direct examination, Williams testified that, at Moore's request, he accepted delivery of three African art books from Contonou, Benin, the books containing packages of heroin.[36] On cross, Moore challenged this testimony, suggesting that the government coached Williams and that Williams did not actually know about the contents of the books. Corroborating Williams's testimony, a DEA agent described the similarities of the three packages Williams received. Each had been addressed to a Professor, bore the same return address, and was shipped via DHL. The DEA agent testified that DHL notified him about a fourth package, similar in weight to the other three and bearing the same return address. The package contained an African art book with heroin hidden inside the front and back covers. The DEA agent explained that with Williams's cooperation he ordered two more heroin shipments. Both arrived from Benin inside African art books. The government proffered this justification for the testimony: "[the illicit materials] even if intended for someone outside the conspiracy, corroborates that Hillary Williams did receive an African Art book containing 150 grams in the cover from exactly the same return address [on] it." Moore does not contest the relevance of this testimony, though he objected to potential confusion in the inclusion of this uncharged quantity of heroin.

---

[36] Since Williams's packages were not recovered, the government introduced the shipping documents.

14

Finally, the DEA agent testified that he asked Williams's supplier to send heroin through a courier instead of in a book. Exhibits 35 (DEA agent's testimony), 36 (heroin), and 42 (lab report identifying the drug) were entered into the record. Moore contends that the government offered no new justification for the submission of this additional evidence, that the evidence related to the heroin seized from the drug courier is "irrelevant to the proceedings altogether," as the *modus operandi* differed, and that it is unduly prejudicial.[37] The government contends that the evidence was properly admitted to refute Moore's challenge to Williams's testimony that he knowingly received heroin from a source in Benin through Tunde.[38]

In response to Moore's objections, the district court instructed the jury on at least two occasions to consider the evidence only to corroborate Williams's testimony.[39] Moore contends that the limiting instruction did not rectify the error

---

[37] *See* FED.R.EVID. 403.

[38] Relevant evidence need only make the existence of a material fact "more probable or less probable than it would be without the evidence." FED.R.EVID. 401. The government argues that this evidence is also relevant to an e-mail from Tunde to Williams in which the two discussed the use of a courier rather than mail.

[39] The district court warned the jury, stating that the government offered the additional drug sales "in connection with [the government's] arguments relative to the credibility of Hillary Williams." Also, "...what the government's alleging is that these last exhibits are used to bolster, according to the government, its witness' credibility, because you have to make that decision, the government doesn't make that, it's just their judgment and that the amount of substance which you heard testimony is heroin in that particular exhibit, I think it's either 32, is not to be used by you in assessing the weight of any heroin if you get to that point in your verdict, okay."

15

particularly because the government improperly used the evidence in its closing to implicate guilt, after the limiting instructions had been issued.[40]  We disagree.

"[E]ven if the district court abused it discretion, such 'abuse is only reversible if the error affected a substantial right of the complaining party,' i.e., we would subject the abuse to harmless error review...."[41]  Even if the district court abused its discretion, any error was harmless, mitigated by the district court's limiting instructions, as independent and uncolored evidence provides ample basis upon which a jury could have convicted Moore.


VI

In his supplemental, *pro se* brief, Moore contends that the district court made five errors in its jury instructions related to conspiracy and burden of proof.  A defendant abandons issues raised in a supplemental brief when not raised and argued in the original brief.[42]  In any event, Moore's contentions fail on the merits, particularly since Moore did not object on these grounds before the

---

[40]  The government stated: "He waiting at the Sheraton for three days to give Noah Moore's mother a brief with seven issues or seven diamonds, seven watches, seven postcards or seven, 700 grams of heroin, a courier with 700 grams of heroin.  How could that work?  Let's look at Government Exhibit 42."

[41]  *United States v. Akpan*, 407 F.3d 360, 369 (5th Cir. 2005) (citations omitted).

[42]  *United States v. Bullock*, 71 F.3d 171, 178-179 (5th Cir. 1995) (citing *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994)); *see also Hadnot v. Bay, Ltd.*, 344 F.3d 474, 476 n.4 (5th Cir. 2003).

16

district court and plain error review consequently applies.[43]  "We are satisfied that no injustice is done by deeming [the defendant's] issues waived."[44]

## VII

Lastly, Moore objected to the calculation of his sentence during the sentencing hearing.  Specifically, he alleged that a jury did not find the quantity of drugs, a leadership role, an obstruction of justice enhancement, or the enhancements advocated in the PSR based on a separate charging document.  The government concedes preserved *Booker*[45] error.  Pursuant to a properly preserved *Booker* objection, we will vacate and remand for resentencing unless the government can establish harmless error beyond a reasonable doubt.[46]

The burden of proving that "the district court would not have sentenced [Moore] differently had it acted under an advisory Guidelines regime" rests upon the government.[47]  It cites an unpublished opinion, *United States v. Prones*, for the proposition that "the district court's conscious decision not to award a

---

[43]  *United States v. Cyprian*, 197 F.3d 736, 741 (5th Cir. 1999).

[44]  *Bullock*, 71 F.3d at 179.

[45]  *United States v. Booker*, 125 S.Ct. 738 (2005).

[46]  *United States v. Pineiro*, 410 F.3d 282, 284 (5th Cir. 2005).

[47]  *Akpan*, 407 F.3d at 377.

concurrent sentence [means] that any *Booker* error was harmless beyond a reasonable doubt."[48]   The government argues that the district court's decision to run Moore's sentence consecutively with his previous, 295-month drug trafficking sentence came after much judicial effort.[49]   Moore had 59 months remaining in this former sentence, and the district court's decision to impose 200 months in addition to the remaining 59 months evidences the court's unwillingness to reduce the sentence, irrespective of the mandatory Guidelines.[50]

"However, whether imposition of consecutive sentences is sufficient to demonstrate that a Booker error is harmless is a fact-sensitive inquiry that must examine the relationship between the two sentences imposed."[51]   Moore's convictions are not factually related.   Even so, after selecting a sentence of 200 months from

---

[48]   145 Fed. Appx. 481, 481 (5th Cir. 2005).

[49]   The government cites a passage in which the district court notes the consideration given to Moore's sentence.  This passage does not expressly mention the decision to run the sentences consecutively.

[50]   *But cf. United States v. Olivares-Martinez*, 767 F.2d 1135, 1137 (5th Cir. 1985) (stating that "consecutive sentencing is an appropriate mechanism for imposing distinct punishment for separate criminal acts, and that a defendant has no right to have concurrent sentences imposed for two totally unrelated offenses" (citations omitted)).

[51]   *United States v. Woods*, 2006 U.S. App. LEXIS 3437, 12-13 (5th Cir. 2006) (stating that the imposition of a consecutive sentence based on unrelated charges does not weigh in favor of harmless error). *United States v. Garza*, 429 F.3d 165, 170 (5th Cir. 2005) ("Second, in an unpublished decision, we determined that Booker error was harmless where the sentencing court expressly refused to run the defendant's federal Guidelines sentence concurrently with his state sentence.  We find that the Government's evidence in the instant case falls woefully short of the circumstances presented in these cases" (citations omitted).).

18

within the mandated range of 188-235 months, the district court had a binary choice in sentencing Moore—a 59-month difference between the two options. The record does not demonstrate beyond a reasonable doubt that the district court wanted to sentence Moore to as many as 259 months. Constrained by the Guidelines, the district court could not freely sentence Moore between the 200 and 259-month terms.

We AFFIRM the conviction and, in light of the *Booker* error, REMAND to the district court so that it may resentence Moore if, in its discretion under the now-advisory Guidelines, it so chooses.