United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 24, 2006**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

————————

No. 05-70032

————————

RYAN HEATH DICKSON,

Petitioner-Appellant,

versus

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS
DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL
INSTITUTIONS DIVISION,

Respondent-Appellee.

Appeal from the United States District Court
For the Northern District of Texas

Before GARZA, DeMOSS, and CLEMENT, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Ryan Heath Dickson, a Texas death row inmate, appeals the denial of his 28 U.S.C. § 2254 habeas corpus petition. He claims that the State failed to disclose the existence of two audiotapes containing potential impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and that the federal district court erred by denying his petition for habeas relief.

I

On November 27, 1994, police in Amarillo, Texas, were called to a small grocery store operated by Carmelo Surace and his wife, Marie. When they arrived, the officers found Marie dead and Carmelo critically injured. The police learned that four young males—Petitioner, his younger brother Dane Dickson, Freddie Medina, and Jeremy Brown—had been involved in an attempt to steal beer from the store. After first gathering outside the store, the two brothers entered while Medina and Brown remained outside. Sometime thereafter, Petitioner shot and injured Carmelo with a sawed-off rifle he had carried into the store. Before fleeing, Petitioner allegedly shot and killed Marie. Carmelo later died from his injuries.

The State charged Petitioner separately for the murder of each victim. Without multiple victims, the State had to prove that Petitioner intentionally killed Carmelo Surace during the course of a robbery to establish capital murder under Texas Penal Code section 19.03(a)(2). *See* TEX. PENAL CODE § 19.03(a)(2) (2003) (stating that a person commits capital murder if he commits murder under section 19.02(b)(1) and, *inter alia*, "the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat"). Although Petitioner acknowledged responsibility for killing Carmelo, he denied that he did so intentionally. He argued that Carmelo was killed during a struggle as Petitioner and his brother attempted to steal items from the store.

The testimony of Medina and Brown (the boys who remained outside the store) was an important piece of the State's proof of intent at trial. Medina testified that, before going into the store, Petitioner showed the boys a gun. Brown asked him what it was for, and Petitioner responded that he was going to shoot the store owners. Brown also testified that Petitioner expressed an intent

to shoot the store owners but could not recall whether he saw Petitioner with the gun outside the store or at an earlier time that day. Defense counsel argued that the only direct evidence of intent was the testimony of Brown and Medina and that this testimony was fabricated.

The jury found Petitioner guilty of capital murder, and the state court sentenced him to death. The Texas Court of Criminal Appeals affirmed the conviction and death sentence on direct appeal.

After conviction, the State revealed that prosecutors had not given the defense access to audiotapes of pretrial interviews with Brown and Dane Dickson.[1] During these interviews, prosecutors questioned the two about the day's events and used written statements the young men had given to police at the time of the killings to both confirm and refresh their recollection prior to trial. Transcripts of these sessions indicate that Brown and Dane Dickson questioned the accuracy of their prior written statements and expressed doubt regarding certain factual assertions that were relevant to the State's case.

Brown asserted in his written statement that Petitioner verbalized an intent to shoot Carmelo and Marie Surace prior to entering the store: "I asked [Petitioner] if they were going to shoot them and he said, 'yeah.'" During the pretrial interview, however, Brown equivocated and seemed unsure that Petitioner had done so.

---

[1] One of the State's trial attorneys tape recorded his interviews with certain witnesses in criminal cases. He acknowledged that he may have recorded his interviews with other witnesses in addition to Brown and Dane Dickson but never made any of the tapes or transcripts available to the defense team. According to the prosecutor, he never considered whether the tapes should be provided to the defense team. "I don't know that I consciously thought about it one way or the other. I believed it was like - - it was like taking notes to me. It was like my work product." Although other State prosecutors were present during the interviews, none of them ensured that the audiotapes were placed in the "open file" for the defense team. Although not entirely clear, it appears that a State attorney, before or during the state habeas proceeding, discovered the audiotapes of the Brown and Dane Dickson interviews and disclosed them. No other audiotapes were discovered in the State's files.

Q. Alright. Do you recall asking [Petitioner] whether or not he was going to shoot somebody?

A. I may have said do not shoot nobody but I don't think I would've asked him what he was going to do.

. . . .

Q. Okay. And you don't recall - - in the statement here, it says, I asked [Petitioner] if they were going to shoot them, and he said yeah. You don't recall that?

A. It may have happened like that.

Q. I know it may have happened that way, but what I need to know is did it or did it not happen that way? See what I mean? Because that's important, don't you think?

A. That is an important piece.

Q. Did that happen or did that not happen? And that's what I need to know.

A. I don't know.

Over the course of the interview and after persistent questioning by prosecutors, Brown became more certain that Petitioner expressed an intent to kill prior to entering the store.

Q. Okay. And before going in the store, how clear do you recall him ever talking about shooting them before he actually went in the store?

A. I think it was pretty clear.

. . . .

Q. You guys knew that was what was fixing to happen before the store - - before he went in that store and [you] backed out.

A. I don't know. We may have.

Q. Okay.

A. I knew at one point before they went in the store that - - what he was going to do, yes.

Q. That he was going to shoot them?

A. Right. I don't know if it was before we left the house or not.

Q. But you knew before he went in the store?

A. Yes, sir.

Toward the end of the interview, prosecutors assured Brown that he did not need to worry about being prosecuted for murder because his version of events was consistent with those of the other boys: "Otherwise, you would've been in deep trouble, okay? But I - - again, I want you to know right now, I mean, I - - you don't need to sit and worry that we're going to drag you into the capital

murder, because it's pretty clear that you did not have anything to do with the capital murder." Ultimately, Brown's trial testimony supported the State's theory that Petitioner possessed an intent to kill prior to entering the store.

Under questioning by prosecutors before trial, Dane Dickson retracted certain factual assertions in his written statement. In that statement, he claimed to have been in the store when his brother shot Marie Surace. During his pretrial interview, however, Dane Dickson stated that he did not witness the shooting but, rather, mistakenly "incorporated" what his brother told him about the shooting into his written statement to the police. Although different from his written statement, Dane Dickson's statements during the suppressed pretrial interview are consistent with his later trial testimony and the defense theory that Carmelo was killed during a struggle.

After prosecutors disclosed the existence of the audiotapes, Petitioner filed an application for writ of habeas corpus in state court based, in part, on his claim that the State improperly withheld evidence that could have been used to impeach both witnesses. After receiving evidence and argument, the state trial court found, *inter alia*, the following facts:

13.    Evidence at trial reveals that Carmel[l]o Surace and his wife, Marie Surace, had both been shot during a robbery of their grocery store. Evidence also suggested the weapon used was a single-shot, bolt-action, .22 caliber rifle, which had been sawed off. Some evidence was adduced showing that Mr. Surace might possibly have struggled with his assailant, might possibly have grabbed the barrel of the weapon, and might possibly have been shot as a result of the struggle. Evidence suggested that Mrs. Surace was probably shot after her husband.

14.    The trial testimony of Jeremy Brown indicated that Applicant had told Jeremy of his intent to shoot the "two old people" before entering the store. The first portion of his tape recorded interview, however, is not so conclusive.

15.    The trial testimony given by Dane Dickson was essentially the same as his tape recorded statement, but still there were some differences.

*Ex Parte: Dickson*, No. 38005-01-A, slip op. at 3-4 (47th Dist. Ct., Potter County, Tex. Sep. 22, 2000). The state trial court then issued conclusions of law:

3.      Even if the non-disclosure of the tapes was inadvertent, the fact remains that Defense counsel could possibly have used the contents of the tape recorded statements during cross-examination of these witnesses at trial.

4.      Especially regarding Jeremy Brown's tape recorded interview, Defense [counsel] might have been able to impeach Mr. Brown's trial testimony by showing that for the first 40 to 50 pages of said interview he wasn't sure about Mr. Dickson's intent.

5.      Defense might also have shown that in Mr. Brown's tape recorded interview, it is only after he is informed that he is not likely to be prosecuted for his involvement in this crime that he reveals Mr. Dickson's statement concerning his intent to kill. Although, not a direct "deal" with a witness, Defense counsel might have been able to use the recorded interview to impeach Mr. Brown's trial testimony by showing his reliance on an implied grant of immunity, or to expose his possible bias as a witness in the case.

6.      While the contents of the tape recorded interviews do not contain any directly exculpatory evidence, they do contain potential impeachment material. Harm from the non-disclosure (even though not intentional) of such impeachment material may be presumed from the result obtained in this case.

7.      Had the trial testimony of Jeremy Brown been effectively impeached by the use of the recorded statement, the jury might have chosen to disregard or disbelieve Mr. Brown's trial testimony about Applicant's acknowledgment of intent, and, since this conviction is for the alleged capital murder of Carmel[l]o Surace, only, (the alleged capital murder of Marie Surace is a separate indictment which has not yet been tried), the jury might have reached a different conclusion.

*Id*. at 4-6. Although the state trial court was "not sure that the disclosure of the recorded interviews and their use by Defense counsel at trial would have caused the jury to reach a different verdict" it recommended that Petitioner receive a new trial "[b]ecause of the importance of preserving and maintaining the integrity of the adversarial trial process, and because of the obvious import of a capital murder verdict and death sentence." *Id*. at 6.

-6-

The Texas Court of Criminal Appeals ("TCCA") adopted the state trial court's "findings and conclusions with the exception of conclusion number six wherein the trial judge determined that harm from the non-disclosure of the tape should be presumed." *Ex Parte: Dickson*, No. 47314-01, slip op. at 2 (Tex. Crim. App. Feb. 21, 2001). Citing *Strickler v. Greene*, 527 U.S. 263 (1999), and *Kyles v. Whitley*, 514 U.S. 419 (1995), the TCCA then denied habeas relief.

After exhausting his state remedies, Petitioner filed a federal petition for writ of habeas corpus and renewed his *Brady* claim. The district court reviewed the record and recounted the evidence supporting the conviction. Applying the deferential habeas standard in AEDPA, the district court concluded that the petition for writ of habeas corpus should be denied. *Dickson v. Dretke*, 2:01-CV-0095, slip op. at 1-2 (N.D. Tex. Mar. 23, 2005).[2]

Out of an abundance of caution and based upon the admonition of the Supreme Court in *Miller-El v. Cockrell*, 537 U.S. 322 (2003), we issued a certificate of appealability ("COA") to allow Petitioner the opportunity to fully brief the merits of his claim. *Dickson v. Quarterman*, 453 F.3d 643 (5th Cir. 2006); *see Miller-El*, 537 U.S. at 338 ("Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail."); *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir.

---

[2] First, despite acknowledging that Brown's pretrial interview could have been used to impeach, the district court concluded that disclosure of his earlier interview statements would not have undermined confidence in the verdict because other evidence of Petitioner's intent to kill, including Medina's trial testimony that Petitioner said he was "going to shoot the two old people in the store" before entering, corroborated his testimony. Second, the district court stated that Brown's pretrial interview would not support a showing of bias because the prosecutor's assurance of non-prosecution took place only after Brown affirmed that Petitioner had expressed an intent to kill. Finally, the district court concluded that Dane Dickson's pretrial interview could not be used to impeach because his testimony at trial was "favorable" to the defense and consistent with his statements in the pretrial interview.

2000) (stating that the court resolves doubts in petitioner's favor in death penalty cases).


II


Under AEDPA, Petitioner is not entitled to federal habeas relief unless the state court's adjudication of his *Brady* claim

>   (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Section 2254(d)(1) applies to pure questions of law as well as mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by th[e] Supreme] Court on a question of law or if the state court decides a case differently than th[e] Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A decision involves an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413.

Section 2254(d)(2) applies to questions of fact. *Martin*, 225 F.3d at 475. Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000) (internal quotation omitted).

Factual determinations by the state court are presumptively correct and will not be disturbed unless rebutted by clear and convincing evidence under § 2254(e)(1). *Morris v. Cain*, 186 F.3d 581, 584 (5th Cir. 1999).

Petitioner argues that the state court adjudication of his *Brady* claim resulted in a decision that is contrary to, or involves an unreasonable application of, federal law. 28 U.S.C. § 2254(d)(1). He argues that the recorded pretrial interviews with Brown and Dane Dickson contained "material" impeachment evidence under *Brady* on the issue of intent to kill.[3] Respondent argues that the district court should be affirmed because the state determination that the evidence was not material is not objectively unreasonable.

"[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Brady*, 373 U.S. at 87). "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). To

---

[3] Petitioner also contends that the federal district court erroneously held a *de novo* evidentiary hearing and failed to defer to state trial court findings of fact. *See* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."). He asserts that the state trial court's findings survived the denial of habeas relief by the TCCA because the TCCA expressly adopted all findings and conclusions of the state trial court, except conclusion six which "presumed" harm from the result obtained in this case. *See Craker v. Procunier*, 756 F.2d 1212, 1213-14 (5th Cir. 1985) (stating that the factual findings of the state trial court survived the appeal to the TCCA because the TCCA did not reject the factual findings). Because we accept the validity of the state court's findings of fact and conclusions of law as adopted by the TCCA, we need not decide whether the district court erroneously failed to defer to state court findings of fact.

prevail on a *Brady* claim, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281-82. Evidence is material where there exists a "reasonable probability" that had it been disclosed the result at trial would have been different. *Banks*, 540 U.S. at 699. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Under AEDPA, we do not decide *de novo* whether a state prisoner has sufficiently proven a *Brady* violation. *See Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004) ("We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a *de novo* matter."); *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002) (*en banc*) ("We have no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of [federal law] is erroneous or incorrect."). Rather, we decide whether the state court's *Brady* determination resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law. *Busby v. Dretke*, 359 F.3d 708, 717 (5th Cir. 2004).[4]

Here, the TCCA accepted every factual finding and conclusion of law of the state habeas court except the conclusion that "harm" may be "presumed" from the result in the case. In citing *Strickler* and *Kyles*, the TCCA rejected the state trial court's conclusion that any impeachment

---

[4] "The statute compels federal courts to review for reasonableness the state court's ultimate decision, not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *see Neal*, 286 F.3d at 246 (holding that a federal court's "focus on the 'unreasonable application' test under section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of evidence").

evidence in the withheld pretrial interviews was material. We review this dispositive determination through the deferential lens provided by Congress in AEDPA. *See Rompilla v. Beard*, 125 S.Ct. 2456, 2462 (2005) (stating that, under AEDPA, the state court decision must have been not only incorrect or erroneous but objectively unreasonable).

Dickson argues that Brown's pretrial interview was material to the issue of intent because "[o]ne can only speculate on the outcome of the trial if the corroboration testimony of Mr. Medina was challenged at trial with the undisclosed tape of Mr. Brown. Both Mr. Brown and Mr. Medina may have been impeached since one story corroborated another." But alleging a speculative outcome is insufficient. Rather, a petitioner must demonstrate a reasonable probability that the result at trial would have been different. *Banks*, 540 U.S. at 698-99. Petitioner has not done so. *See United States v. Moore*, 452 F.3d 382, 388 (5th Cir. 2006) ("[V]ague assertions do not establish any exculpatory evidence, let alone a reasonable probability that such evidence affected the outcome of the trial."). His argument regarding Dane Dickson's pretrial interview statement is similarly deficient. Although suggesting that he could have used the statement, Petitioner does not establish how the result at trial would have been different. *Id.*

Even if we assume the defense could have effectively impeached Brown and Dane Dickson, other probative evidence of an intent to kill prevents us from concluding that the state court determination of immateriality resulted in a decision that involves an unreasonable application of federal law. The State offered evidence that Petitioner: (1) carried a loaded gun into the store; (2) admitted to firing the gun that killed Carmelo Surace; and (3) killed Marie Surace shortly thereafter. Furthermore, the prosecution presented evidence that Petitioner intended to rob the store by force or threat of force, including: (1) testimony that, in the weeks before the offense, Petitioner stated a

desire to rob a store; (2) evidence that Petitioner stole three .22 caliber rifles prior to the robbery; and (3) evidence that Petitioner sawed off the barrel of the rifle and whittled the stock so that it could be concealed. The state court could reasonably conclude that this combined evidence rendered the undisclosed impeachment evidence immaterial because confidence in the outcome was not undermined. *See Kopycinski v. Scott*, 64 F.3d 223, 226 (5th Cir. 1995) (examining corroborating evidence and stating that the materiality inquiry assesses whether disclosure "would have placed the case in a different light so as to undermine confidence in the jury verdict"); *Edmond v. Collins*, 8 F.3d 290, 294 (5th Cir. 1993) (noting that nondisclosed impeachment evidence is cumulative and immaterial when the witness was impeached sufficiently at trial).[5]

We affirm the district court's denial of relief because, even assuming the pretrial interview recordings contained beneficial impeachment evidence, other evidence of Petitioner's intent to kill prevents this court from concluding that the state court's immateriality determination resulted in a decision that involved an unreasonable application of federal law. *See Yarborough*, 541 U.S. at 665 ("Although the question of what an 'unreasonable application' of law might be difficult in some cases, it is not difficult here.").

We pause, however, to express our concern regarding the State's failure to turn over pretrial interview statements by two key witnesses in a death penalty case. The duty of a prosecutor, as the

---

[5] Although a competent defense attorney might have used the taint of bias and misrecollection as to Brown to diminish the effectiveness of Medina's testimony, we cannot say that the TCCA unreasonably concluded that the evidence was immaterial given the other evidence of intent presented at trial. *See United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir. 1989) ("Courts have found . . . that impeachment evidence improperly withheld was not material where the testimony of the witness who might have been impeached was strongly corroborated by additional evidence supporting a guilty verdict. In contrast, where the withheld evidence would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration, the withheld evidence has been found to be material.") (citations omitted).

representative of the sovereign in a criminal case, is "not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935); *see United States v. Leon*, 468 U.S. 897, 900-01 (1984) (recognizing the goal of establishing "procedures under which criminal defendants are 'acquitted or convicted on the basis of all the evidence which exposes the truth' " (quoting *Alderman v. United States*, 394 U.S. 165, 175 (1969))). "Unless, indeed, the adversary system of prosecution is to descend to a gladiatorial level unmitigated by any prosecutorial obligation for the sake of truth, the government simply cannot avoid responsibility for knowing when" disclosure is required. *Kyles*, 514 U.S. at 439. Accordingly, a prosecutor faithfully discharges his duty where he fully understands his obligations under *Brady*, not where, as here, he fails to "consciously th[ink] about it one way or the other."

At oral argument, the State conceded the tapes contain impeachment evidence and implied that an attorney with a "better understanding" of *Brady* would have disclosed them.[6] Although the trial prosecutor apparently believed these recordings were protected work product, these recorded pretrial interview statements contain no protected attorney opinion.[7] Even if the prosecutor wrongly

---

[6] Concession of a disclosure obligation under *Brady* does not, of course, concede a redressable *Brady* violation. *See Strickler*, 527 U.S. at 281 (noting that "the term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence . . . although, strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict").

[7] The Supreme Court has not decided "whether *Brady* requires a prosecutor to turn over his work product." *Mincey v. Head*, 206 F.3d 1106, 1133 n.63 (11th Cir. 2000). At least one commentator states: "Because *Brady* is based on the Constitution, it overrides court-made rules of procedure. Thus, the work-product immunity for discovery in Rule 16(a)(2) prohibits discovery under Rule 16 but it does not alter the prosecutor's duty to disclose material that is within *Brady*." 2 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 254.2 (3d ed. 2000). Although some jurisdictions recognize that "opinion work product" may enjoy some protection, *see, e.g.*, *Williamson v. Moore*, 221 F.3d 1177, 1182 (11th Cir. 2000), the State agreed at oral argument that

-13-

believed the statements contained some protected attorney opinion, he should have known that the duty lay with the trial judge, not the prosecutor, to weigh the need for confidentiality against the defendant's need to use the material to obtain a fair trial.[8]

"Courts, litigants, and juries properly anticipate that 'obligations [to refrain from improper methods to secure a conviction] . . . plainly rest[ing] upon the prosecuting attorney, will be faithfully observed.' " *Banks*, 540 U.S. at 696 (citation omitted) (alteration in original). Indeed, the preservation of our civil liberties depends upon the faithful and ethical exercise of power by those who bear the mantle of public trust. *See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 386 (2004) ("The rigors of the penal system are . . . mitigated by the responsible exercise of prosecutorial discretion" by a "publicly accountable prosecutor . . . under an ethical obligation, not only to win and zealously to advocate for his client but also to serve the cause of justice."). Where, as here, the actions of officials are contrary to these aspirational principles, whether for improper or guileless

---

the prosecutor's assertion of work product in this case was "obviously wrong."

[8] *See In re: United States*, 397 F.3d 274, 285 (5th Cir. 2005) ("In the ordinary case, a party must claim privilege with specificity, and a court can ultimately demand *in camera* review of privileged documents."); *Thomas v. State*, 837 S.W.2d 106, 114 (Tex. Crim. App. 1992) (*en banc*) (asserting that an *in camera* inspection by the trial court accommodates the interest of the State in protecting the identity of informants and the interest of the defendant in *Brady* evidence); *see also United States v. Phillips*, 854 F.2d 273, 277 (7th Cir. 1988) ("[W]hen a criminal defendant seeks to discover information contained in confidential government files, the trial court must balance the competing interests of the defendant and the government in deciding whether and in what form such discovery will be allowed."); *United States v. Dupuy*, 760 F.2d 1492, 1501 (9th Cir. 1985) ("Consultation with the judge is particularly appropriate when the Government has legitimate reasons for protecting the confidentiality of the material requested, for the trial judge can then weigh the Government's need for confidentiality against the defendant's need to use the material in order to obtain a fair trial."); *United States v. Bocra*, 623 F.2d 281, 285 (3d Cir. 1980) ("The submission of discovery materials to the court for an in camera inspection and decision as to which materials are discoverable is commonly used when the Government's need for preserving confidentiality over the materials must be balanced with the defendant's constitutional right to evidence material to his defense.").

-14-

reason, courtroom victories may prove pyrrhic, and such conduct "should attract no judicial approbation." *Banks*, 540 U.S. at 696.[9]

III

We AFFIRM the district court's denial of relief under 28 U.S.C. § 2254.

---

[9] *See Brady*, 373 U.S. at 87 ("Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."); *id*. at 87-88 ("A prosecution that withholds evidence . . . which, if made available, would tend to exculpate [a defendant] or reduce the penalty helps shape a trial . . . that does not comport with standards of justice, even though . . . his action is not 'the result of guile[]' . . . .").