955 So.2d 480 (2007)
Robert Ira PEEDE, Appellant,
v.
STATE of Florida, Appellee.
Robert Ira Peede, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC04-2094, SC05-1885.
Supreme Court of Florida.
January 11, 2007.
Rehearing Denied April 23, 2007.
*485 Neal A. Dupree, Capital Collateral Regional Counsel  Southern Region, Tiffany Murphy and Linda M. McDermott, Special Assistant CCR Counsel, and Andrea Harrington, Assistant CCR Counsel  Southern Region, Fort Lauderdale, FL, for Appellant/Petitioner.
Bill McCollum, Attorney General, Tallahassee, FL, and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellee/Respondent.
PER CURIAM.
Robert Peede appeals the circuit court's denial of his postconviction motion to vacate his conviction of first-degree murder and sentence of death and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. We affirm the trial court's denial of Peede's postconviction motion *486 and deny the petition for writ of habeas corpus.

FACTUAL AND PROCEDURAL HISTORY
Peede was convicted of first-degree murder and sentenced to death for the killing of his wife. The essential facts are outlined in our opinion reviewing the denial of his first postconviction motion in Peede v. State, 748 So.2d 253 (Fla.1999) (Peede II):
The evidence at trial established that Peede returned to Miami to convince Darla [Peede's estranged wife] to go to North Carolina and serve as a decoy in an alleged scheme Peede had to kill his ex-wife and her boyfriend. Peede telephoned Darla and she agreed to pick him up at the airport. However, instead of returning to Darla's home as intended, they mistakenly got on the Florida Turnpike heading for Orlando. As they left the Miami area, Peede pulled a lock-blade knife and inflicted a superficial cut in Darla's side. Subsequently, outside of Orlando, Peede stopped the car, jumped into the back seat, and stabbed Darla in the throat. As a result of this injury, Darla bled to death. Peede was arrested in North Carolina before carrying out his scheme to murder his ex-wife, and he confessed to Darla's murder.
After his trial and conviction, a jury recommended the death penalty. The trial judge followed the jury's recommendation and sentenced Peede to death, finding three aggravating factors [n. 2] and one mitigating circumstance. The trial court found in mitigation that Peede was under the influence of extreme mental or emotional disturbance, but attributed little weight to this finding. On appeal, this Court affirmed Peede's conviction and, although we found that the murder was not cold, calculated and premeditated (CCP), we nevertheless upheld the death penalty. See Peede v. State, 474 So.2d 808 (Fla. 1985).
[n. 2] The three aggravating factors found by the trial court were: (1) previous conviction of two felony crimes involving the use of force or threat to another person; (2) murder committed during the commission of a kidnapping; and (3) murder committed in a cold, calculated and premeditated manner.
Peede II, 748 So.2d at 254.
We upheld the conviction and sentence on direct appeal. See Peede v. State, 474 So.2d 808, 809 (Fla.1985) (Peede I), and the United States Supreme Court denied Peede's petition for writ of certiorari. Peede v. Florida, 477 U.S. 909, 106 S.Ct. 3286, 91 L.Ed.2d 575 (1986). The governor then signed a death warrant, and Peede filed an emergency postconviction motion, raising fifteen issues.[1] The trial *487 court granted a stay of execution and thereafter scheduled an evidentiary hearing which never took place. Subsequently, Peede filed an amended motion, raising six additional issues.[2]
The trial court eventually denied all of Peede's claims without an evidentiary hearing even though the State conceded the need for an evidentiary hearing on certain claims and the court had scheduled one earlier. On appeal, this Court denied relief on some claims, but remanded for an evidentiary hearing on Peede's claim that he had not received any records pursuant to his request under chapter 119, Florida Statutes; Peede's Brady claims; some of Peede's claims involving ineffective assistance of counsel; and on Peede's claims "concerning his mental competency, the adequacy of the examinations into his competence, and, especially, the adequacy of his counsel's investigation and representation concerning the mental issues." Id. at 259.[3] Upon remand and after an evidentiary hearing, the trial court found that no relief was warranted. Peede now appeals the trial court's denial of his postconviction claims.

Peede's Competency to Proceed with Postconviction Proceedings
Peede first argues that the trial court erred in finding Peede competent to proceed with postconviction proceedings. After our remand, defense counsel filed a motion to determine competency. Thereafter, the trial court appointed experts to examine Peede and conducted a competency hearing wherein testimony was presented by two experts for the defense and two experts appointed by the court. The two defense experts testified that Peede was unable to assist his counsel in the proceedings. The two court-appointed experts were unable to interview Peede because Peede refused; therefore, they were unable to render an opinion on competency. One court-appointed expert, Dr. Alan S. Berns, subsequently reviewed a videotaped interview conducted by a defense expert and thereafter opined in a written report that Peede was competent. Ultimately, the trial court determined that Peede was competent to proceed.
*488 At a status conference after this determination, Peede's new counsel again questioned Peede's competency, and the trial court reaffirmed its prior competency ruling but granted the State's motion for Peede to submit to an examination by a mental health expert selected by the State. The court also granted a defense motion for an additional examination and appointed Dr. Berns to examine Peede. Dr. Berns filed a written report stating that Peede was uncooperative and recommended that Peede be transferred to the psychiatric unit of the Florida State Prison where he could be further observed and evaluated. The State agreed, and Peede was transferred to a state mental health facility.
Thereafter, Dr. David Frank from the psychiatric unit of Union Correctional Institution submitted a report stating that Peede refused most services and evaluations. He concluded that Peede had a personality disorder with antisocial and borderline features that did not require inpatient treatment. Dr. Gloria Calderon, a senior physician at Union, also recommended that Peede's psychiatric classification be lowered because he had not received any mental health treatment that year.
The trial court then conducted another hearing to determine Peede's competency. Dr. Frank, the defense's only witness, testified that Peede was not incompetent to assist his counsel in the proceedings, and that Peede's unwillingness to discuss the circumstances surrounding the murder was not due to any mental illness. During this hearing, the court asked Peede why he would not talk with his lawyer about the murder:
Court: Mr. Peede, why won't you talk to your lawyer about these things?
Peede: Truth is, it hurts too much. So I'm not thinking about it, and I don't want to talk about it.
Court: So it's just a decision. You decided not to talk about these things with your attorney because it's too painful for you; is that what you're saying? Emotionally painful for you? Did you hear my question Mr. Peede?
Peede: Sir, I just told you. I don't think about it. I don't talk about it. That's the end of it. If you want to kill me, kill me. That's it. I'm through with it.
Moreover, although defense counsel asserted that Peede would not discuss the facts of the murder, the evidentiary hearing testimony of Dr. Faye Sultan, a defense witness, demonstrated that Peede had discussed the murder with her. The trial court subsequently found Peede competent to proceed, concluding, "Simply put, Mr. Peede could assist his attorneys, if he wanted to, but is instead choosing not to discuss the facts of this case. It is clear to this Court that Mr. Peede is not incompetent, simply uncooperative."

Legal Standard for Competency
The test for whether a defendant is competent to stand trial is "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understandingand whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). This Court has explained:
"It is the duty of the trial court to determine what weight should be given to conflicting testimony." Mason v. State, 597 So.2d 776, 779 (Fla.1992). "The reports of experts are `merely advisory to the [trial court], which itself retains the responsibility of the decision.'" *489 Hunter v. State, 660 So.2d 244, 247 (Fla.1995) (quoting Muhammad v. State, 494 So.2d 969, 973 (Fla.1986)). Thus, when the experts' reports or testimony conflict regarding competency to proceed, it is the trial court's responsibility to consider all the relevant evidence and resolve such factual disputes. See, e.g., Hardy [v. State], 716 So.2d [761,] at 764 [(Fla.1998)] (citing Hunter, 660 So.2d at 247).
"Where there is sufficient evidence to support the conclusion of the lower court, [this Court] may not substitute [its] judgment for that of the trial judge." Mason, 597 So.2d at 779. A trial court's decision regarding competency will stand absent a showing of abuse of discretion. See, e.g., Hardy, 716 So.2d at 764; Carter v. State, 576 So.2d 1291, 1292 (Fla.1989). Thus, the issue to be addressed by this Court is whether the circuit court abused its discretion in finding [the defendant] competent to proceed in his postconviction proceedings. In addressing that issue, we are mindful that a trial court's decision does not constitute an abuse of discretion "unless no reasonable person would take the view adopted by the trial court." Scott v. State, 717 So.2d 908, 911 (Fla.1998).
Alston v. State, 894 So.2d 46, 54 (Fla.2004); see also Fla. R.Crim. P. 3.211.
Upon review of the record, with special attention to the lack of cooperation by Peede, we conclude there is sufficient evidence to support the conclusion of the trial court finding Peede competent to proceed in postconviction proceedings. The trial court entertained multiple motions from the defense regarding Peede's competency, ordered Peede to a psychiatric facility to be observed even after finding him competent, held multiple hearings during which the court discussed the issue with Peede himself, and considered various experts' testimony and written reports. In short, the record supports the trial court's ruling that Peede was competent to proceed in postconviction proceedings, and that any difficulties in communicating with counsel were of Peede's own choosing rather than due to any mental defects.

Ineffective Assistance of Counsel at the Penalty Phase
Peede next argues that his counsel was ineffective during the penalty phase of his trial. During the penalty phase, defense counsel called one expert witness, psychiatrist Dr. Robert Kirkland, to testify regarding Peede's mental health. Dr. Kirkland had been practicing for over twenty years and had given testimony in court as an expert in forensic psychiatry fifty to one hundred times before Peede's trial. Dr. Kirkland interviewed Peede twice, once before trial and once after Peede was convicted. He expressed his opinion that the capital felony "of which Mr. Peede was convicted was committed while Mr. Peede was under the influence of extreme mental and emotional disturbance" based on the interviews he had with Peede and Peede's self-reports. On cross-examination, Dr. Kirkland admitted that he had not reviewed prior medical records or interviewed witnesses who knew Peede. Defense counsel also presented numerous supportive letters from Peede's family and friends. As noted previously, the jury recommended a sentence of death.
At the postconviction evidentiary hearing, Nancy Wagoner, Peede's aunt, testified to Peede's early life. She testified that Peede was born with a severe blistering skin condition and was sometimes unable to walk. Peede also suffered from scoliosis, a curvature of the spine severe enough to require braces. Peede's mother, who later committed suicide, would *490 spank him for making mistakes on his homework, and he would take blame for things he did not do. Peede and his girlfriend got married when Peede was sixteen because his girlfriend was pregnant, but she left him after a year. Peede married his second wife, Geraldine, after she became pregnant, and left Geraldine and their two children a year later. Wagoner went to California to see Peede in jail after he was convicted of second-degree murder. Peede told Wagoner to leave because the authorities were going to kill her and sent Wagoner a magazine in which he believed he saw Geraldine posing nude. Wagoner then testified that Peede struck her shortly before Darla's death and stated that no one had asked her to testify on Peede's behalf at his trial, but she would have testified if asked.
John Bell, a childhood friend of Peede's, testified that he had not seen Peede in years. During Bell's testimony, Peede threatened and accused Bell of sleeping with Geraldine and fathering Peede's youngest son. Peede then absented himself from the hearing, and Bell continued his testimony, stating that Peede was teased because of his blisters and did not have many friends. Bell testified that Peede had a bad temper and confronted Bell about sleeping with Geraldine, which caused Bell to be cautious around Peede.
Michael Thomas Brown, Peede's cousin, testified that Peede had blisters and felt he was smaller than others. Peede was also overly aggressive with women, and told Brown that Peede was in a relationship with Calvin Wagner, implying that Peede was bisexual. Peede also accused Brown of sleeping with Geraldine.
Dorothy Sedgwick, the prosecutor in Peede's trial, testified that all the witnesses Peede's counsel interviewed in North Carolina were from the State's witness list. She testified that Peede's counsel, Theotis Bronson, maintained the view that Peede would be convicted of no more than second-degree murder in the case.
Joseph DuRocher, Peede's other trial counsel, testified that he was the senior attorney in the felony division of the public defender's office at the time of Peede's trial. He stated that Peede was his most difficult client. The prosecutor offered Peede life in prison, but Peede refused; DuRocher thereafter took the second chair in the case with Bronson assuming primary responsibility. DuRocher stated that the preparation for a penalty phase should begin when the case is filed, but admitted that he did not prepare for Peede's penalty phase before trial, relying on a couple of weeks between the guilt phase and the penalty phase to prepare. DuRocher did not furnish Dr. Kirkland any background records or names of witnesses to prepare Dr. Kirkland for his interview with Peede. DuRocher was not aware of Peede's skin disease, scoliosis, discipline by his mother, his insecurities, his alcohol and drug abuse, or his mother's suicide. On cross-examination, DuRocher testified that Peede would not allow his counsel to cross-examine Darla's daughters, refused to wear a suit after the first day of trial, tried to walk out of trial, and told DuRocher to "keep [his] goddamn hands off [him]." DuRocher also testified that he was aware of Peede's California case, and that he had contact with Nancy Wagoner. He also said that he had called some mitigation witnesses, but that relying on anything other than statutory mitigators would have been novel during the time of Peede's trial.
Theotis Bronson, Peede's other trial counsel, now a judge, testified that he had never tried a death penalty case before Peede's case. He stated that Peede wanted the trial to happen fast and Peede wanted to be executed. Bronson did not recall specific responsibilities of the two *491 defense attorneys during the penalty phase. Peede never assisted his counsel and did not provide background information, so Bronson sought DuRocher's help because Peede would not communicate. However, Bronson did know about Peede's mother's suicide. Bronson stated that Dr. Kirkland's first report regarding Peede's competency to stand trial turned up items of interest for the penalty phase, but Bronson did not recall telling Dr. Kirkland that Peede seemed to have several personalities, that his mother committed suicide, or that Darla hoped to reconcile with Peede.
Dr. Sultan testified at the postconviction hearing that she interviewed Peede on three occasions, and that Peede was very hostile during the first interview. She described his blisters and his attachment to his mother, and said that Peede felt sexually inadequate and emotionally scarred. He felt responsible for his mother's death, and he suspected family members of sleeping with his second wife Geraldine. Peede knew Darla for ten or eleven days before they got married, and thought she was posing nude in magazines with Geraldine but came to Florida to reunite with Darla. Dr. Sultan interviewed witnesses who said Peede had been acting crazily in the weeks prior to Darla's murder. Dr. Sultan testified that Dr. Kirkland's evaluation was inadequate and she opined that Peede had Delusional Disorder, Jealous Type and Paranoid Personality Disorder. She believed that Peede qualified for the statutory mitigator of inability to conform his behavior to the law. On cross-examination, Dr. Sultan admitted that both Dr. Kirkland and she felt Peede was paranoid, and that Peede knew right from wrong. She also expressed her opinion that any psychologist working to support the imposition of the death penalty was unethical.
Dr. Fisher, a clinical psychologist, testified that he performed a competency review of Peede in 2000 and again in 2003. He concluded that Peede had "Delusional Disorder of a paranoid jealous type." He also believed that Dr. Kirkland's evaluation was deficient because although he discussed paranoia and delusion, he did not explain how it related to the crime. Dr. Fisher opined that Peede was delusional at the time of the murder and that both statutory mental mitigators of extreme emotional disturbance and the inability to conform conduct applied to Peede's case.
Dr. Sidney Merin, a State witness, testified that Peede would not allow an examination. Dr. Merin looked at Peede's records and concluded that Peede had a Paranoid Personality Disorder with borderline antisocial features. He ruled out a delusional disorder and stated that Peede knew the wrongfulness of his actions at the time of Darla's murder and was capable of conforming his behavior to the requirements of the law. Peede's behavior was goal-directed, coherent, and relevant; also, he was able to make decisions. Dr. Merin disagreed with Dr. Kirkland's finding of the emotional distress mitigator but thought Dr. Kirkland's conclusion that Peede had a paranoid disorder was consistent with his own conclusions.
Dr. Frank, a psychiatrist serving jail inmates who had testified during the competency hearing, was also called by the State. Dr. Frank interviewed Peede three times and spent about nine hours of time with him. Dr. Frank concluded that Peede had Delusional Disorder, Jealous Type, and a personality disorder with antisocial and borderline features or traits. He felt Peede knew the wrongfulness of Darla's murder because when a hitchhiker got in the car, Peede hid the knife he used to kill Darla, and he knew to pull the car over before stabbing Darla. Finally, Dr. Frank opined that Peede had the ability to choose what he wanted to do and when, but that *492 the statutory extreme emotional disturbance mitigator would apply to Peede.
The circuit court denied all of Peede's claims regarding his counsel's ineffectiveness. The court primarily found that Peede refused to provide his counsel with names of witnesses who could present mitigating evidence. Second, the court found that trial counsel's actions in attempting to locate and interview background witnesses were adequate, especially in the face of Peede's lack of cooperation. Third, the court held that the testimony of three postconviction defense mitigation witnesses established that Peede had always been an angry and suspicious person and this evidence would not have been helpful to Peede. Finally, the court found that Dr. Kirkland's testimony would not have been enhanced even if he had been provided more background information.

Ineffectiveness under Strickland

Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citations omitted). Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla. 2004).
Trial counsel has an obligation to conduct a reasonable investigation into mitigation. Strickland, 466 U.S. at 691, 104 S.Ct. 2052; see also Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Counsel's conduct should be judged by a reasonableness standard under prevailing professional norms. For example, the U.S. Supreme Court has consistently cited ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases for capital defense counsel. However, there is a strong presumption that trial counsel's performance was not ineffective. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689, 104 S.Ct. 2052. The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). "Judicial scrutiny of counsel's performance must be highly deferential." Id. In Occhicone v. State, 768 So.2d 1037 (Fla.2000), this Court held that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Id. at 1048.

*493 Deficient Performance
In Peede's case, the circuit court concluded that defense counsel was faced with an uncooperative defendant who would not provide counsel with names of witnesses to interview regarding mitigation. In Cherry v. State, 781 So.2d 1040 (Fla.2000), this Court evaluated penalty phase counsel's performance with a similar defendant:
Cherry failed to provide defense counsel with the names of any witnesses who would testify on Cherry's behalf. During the evidentiary hearing, trial counsel testified that Cherry did not provide him with names of any witnesses who could have provided mitigating evidence. Further, upon commencement of the penalty phase proceeding, trial counsel asked Cherry in open court whether he knew "of anyone who would be able to come in and substantiate mitigating grounds that the Court has enumerated here." Cherry responded in the negative. As the Supreme Court noted in Strickland, "the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Strickland, 466 U.S. at 691, 104 S.Ct. 2052. By failing to provide trial counsel with the names of witnesses who could assist in presenting mitigating evidence, Cherry may not now complain that trial counsel's failure to pursue such mitigation was unreasonable. See id. Accordingly, it appears the trial court correctly found that counsel was not deficient in failing to investigate and present mitigating evidence because Cherry refused to communicate with trial counsel or provide him with names of witnesses to call for mitigation purposes.
Id. at 1050.
Because Peede would not assist his counsel in providing any mitigating evidence or circumstances, the trial court concluded he cannot now complain that his counsel performed ineffectively in failing to pursue additional mitigation. The trial court also found that despite Peede's lack of cooperation, Peede's counsel employed an investigator and interviewed Peede's family and friends. Counsel also submitted some thirteen letters of support from Peede's friends and family to the jury. Ultimately, the trial court concluded that this performance, although not perfect, was adequate to meet the demands of Strickland and its progeny. We agree with that conclusion. Factually the record supports both the finding of lack of cooperation by Peede and counsel's efforts notwithstanding Peede's recalcitrance. We find no Strickland error in the trial court's evaluation and conclusions.
The mitigating evidence Peede presented during the evidentiary hearing was his mother's suicide, his blistering skin condition as a child, his paranoid behavior regarding his wives' alleged sexual exploits, and his feelings of inadequacy. While this evidence could indeed be seen as mitigating, this mitigation would have been offset by the testimony of Peede's aggressive and impulsive behavior towards women, including his hitting Nancy Wagoner prior to killing Darla, and his bizarre accusations to various friends and family of sleeping with his second wife, Geraldine. It appears that Peede's aggression has not subsided in the years since the murder either. This is illustrated by Peede's reaction when his counsel put his childhood friend John Bell on the stand during the evidentiary hearing; Peede accused him of fathering his youngest child and threatened that he would shoot Bell if he had a gun. With this background of bizarre behavior and hostility, and because of Peede's refusal to allow his counsel to cross-examine *494 Darla's daughters while they were on the stand during the guilt phase of his trial, reasonable defense counsel would hesitate before putting any of Peede's friends and family on the stand during the penalty phase.
With regards to counsel's failure to provide Dr. Kirkland with sufficient background information to evaluate Peede for the penalty phase, we note that Dr. Kirkland, a highly respected psychiatrist, interviewed Peede twice. He, in fact, provided evidence favorable to Peede in that he opined that the extreme emotional disturbance mitigator applied in Peede's case, and the trial court agreed. The fact that Peede produced more favorable expert testimony at his evidentiary hearing is not reason enough to deem trial counsel ineffective. See Gaskin v. State, 822 So.2d 1243, 1250 (Fla.2002) ("[C]ounsel's reasonable mental health investigation is not rendered incompetent `merely because the defendant has now secured the testimony of a more favorable mental health expert.'") (quoting Asay v. State, 769 So.2d 974, 986 (Fla.2000)). Postconviction experts have the benefit of hindsight, and of researching for a long period of time the factual circumstances surrounding the case with the benefit of the trial record. Moreover, although Peede's experts believed the trial court should have found the mitigator regarding capacity to conform conduct to the requirements of the law, the circuit court was within its discretion to agree with the expert witnesses who did not share this belief.

Prejudice
Even if deficient performance had been established, it is apparent that prejudice was not. As noted above, in order for a defendant to meet the prejudice prong of Strickland, "the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined." Maxwell, 490 So.2d at 932. Here, the record reflects that the proffered mitigation developed in the evidentiary hearing would have been countered by the substantial negative aspects of Peede's character and past brought out by the mitigation witnesses and by the established aggravators in this case. Additionally, Peede has not demonstrated prejudice by Dr. Kirkland's lack of background information because Dr. Kirkland's essential views would not have changed, and further, the mitigator of extreme mental or emotional disturbance was considered by the trial court due to Dr. Kirkland's testimony. In fact, the experts at the evidentiary hearing essentially agreed with many of Dr. Kirkland's main findings. Although this Court found that the CCP aggravator was not supported by the evidence, the trial court found two other substantial aggravators based on Peede having been previously convicted of two felony crimes involving the use or threat of violence, one of these crimes being second-degree murder, and the murder being committed in the commission of kidnapping. In sum, we find no error by the trial court in concluding that Peede has not demonstrated prejudice, and we affirm the trial court's denial of this claim.

Mental Health Examination
Peede next argues that he was denied an adequate mental health examination in violation of Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).
In Ake, the United States Supreme Court held that
when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent *495 psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.
470 U.S. at 83, 105 S.Ct. 1087. The circuit court found that Dr. Kirkland's evaluations were appropriate and met the requirements of Ake. We find that Peede's claim is without merit. Defense counsel sought the appointment of Dr. Kirkland to evaluate Peede's mental health and competency because he believed Dr. Kirkland was the preeminent forensic psychiatrist in the area in the late 1970s and 1980s. Defense counsel DuRocher testified at the evidentiary hearing that Dr. Kirkland first evaluated Peede for competency long before the State offered Peede a plea deal, and defense counsel Bronson stated that Dr. Kirkland's first report turned up helpful issues for the penalty phase. Although it is true that Dr. Kirkland did not have available to him Peede's records or other background information the evidentiary hearing experts had at their disposal, Dr. Kirkland arrived at conclusions similar to the current experts' findings. For example, Dr. Kirkland testified to the existence of the extreme emotional disturbance statutory mitigator during the penalty phase. Dr. Sultan testified during the evidentiary hearing that Peede fit both the extreme emotional disturbance mitigator and the inability to conform behavior mitigator, but admitted that her findings were similar to Dr. Kirkland's. Dr. Fisher also admitted that Dr. Kirkland's reports contained findings and observations similar to Dr. Fisher's own conclusions.
We have consistently held that a mental health investigation is not rendered inadequate "merely because the defendant has now secured the testimony of a more favorable mental health expert." Asay, 769 So.2d at 986 (citing Jones v. State, 732 So.2d 313, 320 (Fla.1999); Rose v. State, 617 So.2d 291, 294 (Fla.1993)). Obviously, defense counsel sought Dr. Kirkland's appointment because of Dr. Kirkland's reputation. However, there is no guarantee in such a situation that the expert will develop only favorable opinions. In essence, Dr. Kirkland's evaluation produced a "mixed bag" of favorable and unfavorable opinions, but that is always the risk. Finally, as the circuit court noted in its order:
[I]t appears that much of the difference between Dr. Kirkland's conclusions and those of the current defense experts is semantic. As explained by Dr. David Frank, testifying for the State, the earlier version of the Diagnostic and Statistical Manual (or "D[SM] III") references a "paranoid disorder" that is now referred to in the current version of the Manual (the "DSM-IV-TR") as a "delusional disorder." Therefore, although Dr. Kirkland did not label his diagnosis as a "delusional disorder," it appears that this was simply because he quite appropriately used the term ("paranoia") recognized by the then-current diagnostic manual.
In short, we find no abuse of discretion or error in the trial court's ultimate conclusion that the mental health evaluations of Dr. Kirkland were adequate under Ake. Therefore, we affirm the circuit court's denial of this claim.

Brady Claims
Peede next argues that the State withheld Darla's diary and police reports from Peede's murder conviction in California in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Brady requires the State to disclose material information within its possession or control that is favorable to the defense. Mordenti v. State, 894 So.2d 161, 168 (Fla.2004) (citing Guzman v. State, 868 So.2d 498, 508 (Fla. *496 2003)). To establish a Brady violation, the defendant has the burden to show (1) that favorable evidenceeither exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).
To establish prejudice or materiality under Brady, a defendant must demonstrate "a reasonable probability that the jury verdict would have been different had the suppressed information been used at trial." Smith v. State, [931 So.2d 790, 796 (Fla.2006)] (citing Strickler v. Greene, 527 U.S. 263, 289[, 119 S.Ct. 1936, 144 L.Ed.2d 286] (1999)). "In other words, the question is whether `the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Id. (quoting Strickler, 527 U.S. at 290, 119 S.Ct. 1936).
Ponticelli v. State, 941 So.2d 1073, 1084-85 (Fla.2006). A similar standard is used to evaluate prejudice in an ineffective assistance of counsel claim, Strickland, 466 U.S. at 687, 104 S.Ct. 2052, and the remedy is retrial. Strickler, 527 U.S. at 290, 119 S.Ct. 1936 (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).
Giving deference to the trial court on questions of fact, this Court reviews de novo the application of the law and independently reviews the cumulative effect of the suppressed evidence. See Mordenti, 894 So.2d at 169; Way v. State, 760 So.2d 903, 913 (Fla.2000) (citing Hays v. Alabama, 85 F.3d 1492, 1498 (11th Cir.1996); Kennedy v. Herring, 54 F.3d 678 (11th Cir.1995); Stephens v. State, 748 So.2d 1028 (Fla.1999)).

Darla Peede's Diary
This Court held in Peede's initial postconviction appeal that the record did not disclose whether the State had possession of Darla's diary in its files or whether Peede had access to it, and that an evidentiary hearing was warranted on the issue. Peede II, 748 So.2d at 257-58. However, at the evidentiary hearing, the prosecutor testified that the parties in this case participated in full reciprocal discovery. She testified that defense counsel Bronson was made aware of the diary and had examined it. The prosecutor asked Bronson if he wanted a copy of the diary, and he said no because he did not think it was admissible, and the prosecutor agreed. While defense counsel DuRocher had no memory of seeing the diary prior to preparing for the evidentiary hearing, defense counsel Bronson testified that he was aware of the substance of the information that was contained in the diary generally, although he could not recall seeing a written diary. Under these circumstances there is record evidence to support the conclusion of the trial court that the diary and its contents were disclosed to the defense and, hence, no Brady violation occurred.

Statements from Witnesses in California
Concerning statements from witnesses to the California crime, the prosecutor testified at the evidentiary hearing that she received documents related to the case and tracked down eyewitnesses and Peede's defense attorney in the case. She also stated that any information the prosecution received would have been given to the defense pursuant to discovery. The prosecutor testified that she had numerous discussions with defense counsel Bronson about how the jury would react to a prior murder conviction, and that Bronson was aware the prosecution intended to use the conviction in trial.
*497 Defense counsel DuRocher testified that the defense "knew of the California homicide. I think we'd even had some conversation with the lead investigator there." He also admitted that a statement from a witness taken by the same detective that took other witness statements in California was in the Public Defender file for the case. Defense counsel Bronson testified that he was aware of the information surrounding the California shooting, and recalled reading a number of reports.
"There is no Brady violation where the information is equally accessible to the defense and the prosecution, or where the defense either had the information or could have obtained it through the exercise of reasonable diligence." Provenzano v. State, 616 So.2d 428, 430 (Fla.1993) (citing Hegwood v. State, 575 So.2d 170, 172 (Fla.1991); James v. State, 453 So.2d 786, 790 (Fla.1984)). It is apparent that this rule applies to the California police reports of Peede's involvement in a homicide in that state. Therefore, we affirm the circuit court's finding of no Brady violation.[4]

Peede's Competency at the Time of Trial
Peede next argues that he was not mentally competent to stand trial in 1984. The trial court denied Peede's claim as "wholly without merit" because even accepting their testimony, the defense mental health experts testified that Peede's delusional disorder was narrowly confined to the single topic of his former wives being unfaithful to him, rather than his ability to assist counsel.
The test for whether a defendant is competent to stand trial is "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understandingand whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). "The reports of experts are `merely advisory to the [trial court], which itself retains the responsibility of the decision.'" Hunter v. State, 660 So.2d 244, 247 (Fla. 1995) (quoting Muhammad v. State, 494 So.2d 969, 973 (Fla.1986)). "The trial court must consider all evidence relative to competence and its decision will stand absent a showing of abuse of discretion." Id. (citing Carter v. State, 576 So.2d 1291, 1292 (Fla.1989)).
Trial counsel DuRocher testified that he never had a client as difficult as Peede, but trial counsel Bronson testified that he never thought Peede was insane or delusional. Dr. Kirkland was first appointed to evaluate Peede's competency prior to trial in 1983. He found that Peede had a paranoid disorder but was not incompetent to stand trial. The original trial judge, Michael Cycmanick, testified at the evidentiary hearing that Peede appeared to be acting freely, voluntarily, and *498 with a clear head when he decided to absent himself from trial. Judge Cycmanick had been involved with competency issues many times before Peede's trial both as a judge and as a defense attorney.
The defense experts at the postconviction evidentiary hearing testified that Peede's delusional disorder was narrowly circumscribed to his belief that his former wives were not faithful to him, and that Peede knew right from wrong. Dr. Fisher testified that Peede only freezes when the subject of the murder comes up. Further, Dr. Merin, the State's expert, specifically testified that Peede was competent to stand trial.
Based on this evidence, we conclude the trial court properly denied this claim after determining that the issue had been addressed in the earlier trial proceedings, and after the evidentiary hearing on this issue. Furthermore, based on this finding, there was no error in the determination that Peede's counsel was not ineffective in presenting the issue of competency to the original trial court.

Ring v. Arizona
Peede next argues that Florida's death penalty statute is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Both the Florida Supreme Court and the United States Supreme Court have held that Ring does not apply retroactively. See Johnson v. State, 904 So.2d 400, 405 (Fla.2005); Schriro v. Summerlin, 542 U.S. 348, 353, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). Peede's death sentence became final long before Ring was decided in 2002; therefore, Peede cannot rely on Ring to find his death sentence unconstitutional. See Washington v. State, 907 So.2d 512, 514 (Fla.) (finding defendant not entitled to relief under Ring because Ring is not applied retroactively), cert. denied, ___ U.S. ___, 126 S.Ct. 802, 163 L.Ed.2d 632 (2005). Thus, we hold that the trial court properly denied this claim.

PETITION FOR WRIT OF HABEAS CORPUS

Ineffectiveness of Appellate Counsel

Failure to Challenge the Introduction of Collateral Crime Evidence
In his first issue in his petition for writ of habeas corpus, Peede argues that appellate counsel was ineffective because counsel failed to raise the issue that the trial court erred in admitting collateral crime evidence. Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for writ of habeas corpus. See Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). Consistent with the Strickland standard, to grant habeas relief based on ineffectiveness of appellate counsel, this Court must determine
first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986). In raising such a claim, "[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Freeman, 761 So.2d at 1069 (citing Knight v. State, 394 So.2d 997 (Fla.1981)). "However, claims of ineffective assistance of appellate counsel may not be used to camouflage issues that should have been raised on direct appeal or in a postconviction motion." Rutherford v. Moore, 774 So.2d 637, 643 (Fla. 2000) (citing Thompson v. State, 759 So.2d *499 650, 657 n. 6 (Fla.2000); Hardwick v. Dugger, 648 So.2d 100, 106 (Fla.1994); Breedlove v. Singletary, 595 So.2d 8, 10 (Fla. 1992)). "If a legal issue `would in all probability have been found to be without merit' had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective." Id. (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994) and citing Kokal v. Dugger, 718 So.2d 138, 142 (Fla.1998); Groover v. Singletary, 656 So.2d 424, 425 (Fla.1995)).
First, Peede argues that appellate counsel was ineffective for failing to argue on appeal that the trial court erred (1) in allowing Tanya Bullis, the victim's daughter, to testify that Darla had told her that she was afraid of Peede trying to kill her along with Geraldine and Calvin; (2) in allowing Rebecca Keniston, the victim's other daughter, to testify that the victim was worried Peede was going to kill Geraldine and "a male person"; (3) in allowing Geraldine Peede, Peede's second wife, to testify regarding the hostile contact she had with Peede; (4) in allowing Special Agent Kent Wilson to testify concerning a statement Peede made to him concerning his plans for killing Geraldine and Calvin after he killed Darla, and that Peede told him that at one point he planned to use Darla as a lure; and (5) in allowing Detective Ross Frederick to testify concerning a confiscated loaded shotgun from Peede's residence. Peede also argues that appellate counsel was ineffective in failing to argue that the trial court erred in allowing pornographic magazines and photographs into evidence[5] and that the prosecutor improperly relied on the above evidence to confuse and anger the jury.
A trial court's ruling on the relevancy of evidence and whether or not the probative value is outweighed by the danger of unfair prejudice is governed by an abuse of discretion standard of review. Williamson v. State, 681 So.2d 688, 696 (Fla.1996). First, concerning the victim's daughters' testimony, appellate counsel did challenge Tanya Bullis's testimony on hearsay grounds on direct appeal and this Court rejected the argument, finding that Peede failed to object to two of Bullis's statements, causing the issue to be unpreserved for appeal, and finding that the testimony was relevant to the victim's state of mind. Peede I, 474 So.2d at 816. Therefore, this issue is procedurally barred. See Fotopoulos v. State, 838 So.2d 1122, 1135-36 (Fla.2002) (holding that "habeas corpus petitions are not to be used for additional appeals on questions which could have been, should have been, or were raised on appeal") (quoting Parker v. Dugger, 550 So.2d 459, 460 (Fla.1989)). Concerning Rebecca Keniston's testimony, the State is correct that defense counsel only objected to this testimony on the basis of double hearsay and not on the relevancy grounds now asserted. Appellate counsel cannot be deemed ineffective for failing to raise an unpreserved issue on appeal.
Regarding Geraldine's testimony, in Muhammad v. State, 782 So.2d 343 (Fla.2001), this Court held that a "defendant's threats to a non-victim are admissible when relevant to prove a material issue, as long as the probative value of the evidence outweighs any undue prejudice." Id. at 358 (citing Pittman v. State, 646 So.2d 167, 170-71 (Fla.1994)). This Court held "that the evidence of [a] threat was admissible to establish the motive and intent *500 for the murder." Id. The State correctly asserts that Geraldine's testimony helped describe the motive to kidnap Darla as part of Peede's plan to murder Geraldine and Calvin. See Buenoano v. State, 527 So.2d 194, 197 (Fla.1988) (finding collateral crime evidence admissible to prove motive); Williams v. State, 110 So.2d 654, 659-60 (Fla.1959) (holding that evidence is admissible if relevant to show motive). The State further asserts this testimony was relevant because it served to corroborate Peede's confession, in which he stated his intent to "do what he wanted to do to these other two people," which was kill them because he thought he saw them posing together in a swinger magazine. Peede "said at one point that he intended to use Darla to lure them to a motel where he could kill them." See Thompson v. State, 565 So.2d 1311, 1315 (Fla.1990) (finding that admitted photographs were relevant to show that the defendant's out-of-court confessions were consistent with the evidence found at the crime scene); Newell v. State, 772 So.2d 597, 598 (Fla. 5th DCA 2000) (holding that "evidence became relevant to corroborate the purported confession").
We find merit in the State's contentions. While Peede argues that the prosecutor needlessly relied on the uncharged attempted murders of Geraldine and Calvin, this Court has held that evidence of uncharged crimes can be admitted if inseparable from the crime for which the defendant is being tried. See Smith v. State, 699 So.2d 629, 645 (Fla.1997) (holding that evidence of an uncharged "sexual battery was relevant as an inseparable part of the criminal episode at issue and not unduly prejudicial") (citing § 90.402, Fla. Stat. (1989); Griffin v. State, 639 So.2d 966, 968-69 (Fla.1994)); Straight v. State, 397 So.2d 903, 908 (Fla.1981) ("[E]vidence of criminal activity not charged is admissible if relevant to an issue of material fact."). "Among the purposes for which a collateral crime may be admitted is establishment of the entire context out of which the criminal action occurred." Hunter, 660 So.2d at 251 (citing Heiney v. State, 447 So.2d 210, 213-14 (Fla.1984); Ruffin v. State, 397 So.2d 277 (Fla.1981); Smith v. State, 365 So.2d 704 (Fla.1978); Ashley v. State, 265 So.2d 685, 693-94 (Fla.1972)).
Similarly, we agree the trial court did not err in allowing Special Agent Kent Wilson's testimony regarding Peede's statements about killing Geraldine and Calvin because the incident was inextricably intertwined with the rest of the criminal episode and the State was properly allowed to establish context in which the current homicide took place. Finally, Detective Ross Fredericks' testimony regarding the shotgun he confiscated from Peede's residence fits with the rest of the story of this crime, and also serves as evidence of consciousness of guilt. See Anderson v. State, 574 So.2d 87, 93 n. 4 (Fla.1991) ("Proof of a defendant's acts related to the offense charged is admissible to prove a defendant's acknowledgement of guilt.").

Failure to Challenge the Victim's Daughter's Identification Testimony and the Admission of Nude Photographs
Peede next argues that appellate counsel was ineffective in failing to raise the claim that the trial court erred in allowing Rebecca Keniston, the victim's daughter, to testify regarding the identification of the victim's body. Peede also argues that the trial court erred in allowing the introduction of nude photographs into evidence, and that appellate counsel was ineffective in failing to raise these claims on direct appeal.

*501 Victim's Identification
In Thompson, this Court stated:
Courts of this state have followed a long-standing rule that relatives may not be called solely to identify their deceased victims when unrelated, credible witnesses are available to make an identification. The rule is based on the theory that the testimony of relatives is likely to be inflammatory and may arouse unwarranted jury sympathy for the victim, interjecting matters not germane to the issue of guilt or punishment.
565 So.2d at 1314 (citing Dougan v. State, 470 So.2d 697 (Fla.1985); Welty v. State, 402 So.2d 1159 (Fla.1981); Lewis v. State, 377 So.2d 640 (Fla.1979); Rowe v. State, 120 Fla. 649, 163 So. 22 (1935)). "When the state intends to offer such evidence, it must show that it made an effort to find witnesses other than relatives to identify the victim. The family member should be a witness of last resort." Id. In Thompson, this Court held that because there was no evidence in the record that the State made a concerted effort to find other witnesses to identify the victim, it was error to allow the victim's father to identify the victim. Id. However, this Court affirmed the trial court's ruling "that the error was harmless because the witness displayed no emotional outburst or other unduly prejudicial behavior to improperly influence the jury." Id.
In Peede's case, the prosecutor argued that there had been difficulty identifying the victim's body because the murder occurred in transit through multiple states and the body was found and the autopsy performed in a state other than where the victim lived. Rebecca Keniston's testimony regarding the identification was limited:
Q. And what did you do with Harvey Amerson [a police officer in Georgia]?
A. We went to identify my mother's body.
Q. Do you remember what kind of place you went to to do that?
A. A funeral home.
Q. And did you look at more than one body at that funeral home?
A. No.
Q. Was Harvey Amerson with you when you looked at the body?
A. Yes.
Q. When you looked at the body, could you recognize or identify the body that you looked at?
A. Yes.
Q. And who was that body?
A. My mother, Darla Peede.
Q. When you were at the funeral home or while you were there, was any personal articles turned over to you?
A. Yes.
Q. What type of personal articles?
A. Jewelry.
Q. Could you be more specific?
A. A wedding band, a necklace with a heart and a watch, all gold.
Q. Did you recognize those particular pieces of jewelry?
A. Yes.
Q. Where had you seen those pieces of jewelry before?
A. On my mother.
The trial court also verified that the witness would be testifying to other matters besides the identification of the victim, and she was instructed about the importance of maintaining her composure. The State also coordinated her testimony with the previous witnesses' testimony so she would not have to look at any photographs to testify regarding identification. Under these circumstances, while there is little evidence in the record that the State actually *502 made a concerted effort to find an unrelated witness to testify regarding the identification of the victim's body, we conclude that any error that may exist in the admission of Rebecca Keniston's identification testimony was harmless. Mansfield v. State, 758 So.2d 636, 644 (Fla.2000) ("Error is harmless if the reviewing court can say beyond a reasonable doubt that the error did not affect the verdict.") (citing State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986)).

Nude Magazines and Photographs
The State correctly contends that the photographs now objected to formed the motive to kidnap Darla as part of Peede's plan to murder Geraldine and Calvin. See Muhammad, 782 So.2d at 358 (finding evidence of a threat admissible to establish motive and intent for murder). It is also contended that they were relevant because they served to corroborate Peede's confession. See Thompson, 565 So.2d at 1315 (finding that admitted photographs were relevant to show that the defendant's out-of-court confessions were consistent with the evidence found at the crime scene). "The test for the admissibility of photographic evidence is relevance, not necessity." Mansfield, 758 So.2d at 648 (citing Gudinas v. State, 693 So.2d 953, 963 (Fla.1997)). A trial court's ruling on the relevancy of evidence and whether or not the probative value is outweighed by the danger of unfair prejudice is governed by an abuse of discretion standard of review. Williamson, 681 So.2d at 696. "On the other hand, trial courts must be cautious in not permitting unduly prejudicial or particularly inflammatory photographs before the jury." Brooks v. State, 787 So.2d 765, 781 (Fla.2001).[6] We agree with the State's assertions and conclude that the record supports these contentions. Therefore, we find that the trial court did not abuse its discretion in admitting the nude magazines and photographs, and appellate counsel cannot be deemed ineffective for failing to raise this issue on direct appeal.

Right of Confrontation
Peede next argues that his right to confrontation articulated in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), was violated during his trial. This Court has recently held that Crawford does not apply retroactively. See Chandler v. Crosby, 916 So.2d 728, 731 (Fla.2005), cert. denied, ___ U.S. ___, 127 S.Ct. 382, 166 L.Ed.2d 275 (2006). As Peede's conviction became final prior to Crawford, relief is denied on this claim. To the extent Peede is arguing ineffectiveness of appellate counsel, appellate counsel cannot be deemed ineffective for failing to *503 raise a meritless claim or to anticipate a change in the law; therefore, relief is denied.

Prosecutor's Comments and Sentencing Instructions
Peede next argues that the trial court and the State unconstitutionally minimized his jurors' sense of responsibility in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and that appellate counsel was ineffective in failing to raise this issue. Caldwell claims can and should be raised on direct appeal if trial counsel objected regarding these issues in the trial court, making a claim of ineffective assistance of appellate counsel cognizable in these proceedings. King v. Dugger, 555 So.2d 355, 357 (Fla.1990). With regard to alleged improper jury instructions on voir dire, this Court found in Peede II that "to the extent that Peede is alleging that the trial court improperly instructed the jury, the claim is procedurally barred because it should have been raised on direct appeal," and that the record refuted the claim because "[t]he judge's instructions to the jury were neutral on their face, and they merely inquired whether prospective jurors could follow the law." Peede II, 748 So.2d at 258 n. 8. Further, Peede's trial counsel did not object to the prosecutor's or court's comments regarding the jury's role. Therefore, appellate counsel cannot be deemed ineffective for failing to raise an unpreserved claim. Johnson v. Moore, 837 So.2d 343, 347 (Fla.2002) (citing Rutherford, 774 So.2d at 646).
Peede's counsel also did not object to the court's statements during voir dire. During voir dire, the trial court correctly told potential jurors of the gravity of their duty, telling them "[T]he jury's recommendation is given very heavy weight." Although Peede argues that the trial court and prosecutor erred in emphasizing the jury's role as only a recommender of a sentence, we note that Peede's counsel also referred to the jury's advisory sentence as a recommendation when addressing a potential juror and during his closing argument in the penalty phase. Peede's counsel did not object to the court's jury instructions in the guilt phase of the trial, to the prosecutor's calling the jury's sentence a "recommendation" to the court, or to the trial court's jury instructions during the penalty phase. Moreover, the trial court expressed the importance of the jury's role in the penalty phase:
The fact that the determination of whether a majority of you recommended a sentence of death or sentence of life imprisonment in this case can be reached by a single ballot should not influence you to act hastily or without due regard to the gravity of these proceedings. Before you ballot, you should carefully weigh, sift and consider the evidence, and all of it, realizing that human life is at stake, and bring to bear your best judgment in reaching your advisory sentence.
Because we conclude there is no merit to Peede's argument that these statements were erroneous, appellate counsel was not ineffective in failing to raise these issues on appeal. Id. (citing Lambrix v. Singletary, 641 So.2d 847, 848-49 (Fla.1994)).

CONCLUSION
In light of the above analysis, we affirm the trial court's denial of the claims set out in Peede's postconviction motion and deny Peede's petition for writ of habeas corpus.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] The fifteen claims were: (1) Peede was not competent to stand trial; (2) he received an inadequate psychiatric evaluation; (3) he received ineffective assistance of counsel; (4) counsel was ineffective in failing to present an insanity defense; (5) there was a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (6) the instructions diminished the responsibility of the jury; (7) the jury instruction on jurisdiction was improper; (8) there was an improper instruction to the jury shifting the burden of proof to Peede during the penalty phase; (9) the jury instructions created an automatic aggravating circumstance; (10) the instructions in the guilt phase were unconstitutional for failing to explain the unanimity requirement; (11) there was an improper instruction to the jury that a majority vote was needed for a life recommendation; (12) a jury instruction unconstitutionally shifted the burden of proof of mitigation to the defendant; (13) the trial court failed to consider all nonstatutory mitigation; (14) the death sentence was imposed based on an unconstitutionally obtained prior conviction; and (15) there were due process violations where the State presented the factual basis for the prior guilty pleas at the sentencing phase.
[2] The six new issues were: (1) whether the death penalty is constitutional; (2) whether this Court failed to conduct a meaningful harmless error analysis concerning the finding that the murder was cold, calculated and premeditated (CCP); (3) whether the sentencing court failed to properly and timely impose a written sentence of death; (4) whether improper hearsay testimony was admitted; (5) whether the prohibition against interviewing jurors after trial is constitutional; and (6) whether state agencies improperly withheld files and records in violation of chapter 119, Florida Statutes (1993).
[3] This Court interpreted Peede's claims on appeal as being (1) the trial court's due process violation in summarily denying Peede's claims after both the State and the trial court had conceded the need for an evidentiary hearing and when the trial court failed to attach specific portions of the record; (2) the State's failure to disclose public records in violation of chapter 119, Florida Statutes; (3) Peede's incompetence to stand trial; (4) an expert's inadequate psychiatric evaluation; (5) trial counsel's ineffective assistance throughout the course of the trial; (6) the State's Brady violations; (7) the unconstitutionality of the capital sentencing statute; (8) the trial judge's improper instruction to the jury concerning aggravators; and (9) the trial court's failure to consider all nonstatutory mitigators. This Court addressed claims (1), (2), (3), (4), (5), and (6) but held that claims (7), (8), and (9) were procedurally barred because they were raised or should have been raised on direct appeal. Peede II, 748 So.2d at 256 n. 6.
[4] Peede argues that, to the extent this Court finds that defense counsel had available the information that was in the State's possession, his counsel was ineffective during the guilt phase of his trial, and confidence in the outcome of the trial is undermined. However, even if Peede were able to prove that his counsel had Darla's diary and the documents from the California shooting, we conclude that he did not meet the deficient performance and prejudice prongs of Strickland. The diary's contents were of questionable relevance and their admissibility was questionable, and highlighting records from a previous murder conviction would obviously be questionable strategy during the guilt phase of a trial. See Occhicone, 768 So.2d at 1048 ("[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.").
[5] This issue is more fully addressed under the third issue of Peede's Petition for Writ of Habeas Corpus below.
[6] While the State argues that any error concerning the admission of the nude photographs was not preserved for appeal, Peede argues correctly that after the State moved to introduce nude magazines into evidence, Peede's counsel asked for a bench conference. The contents of that conference are not in the record, and Peede argues that Peede's counsel objected to the magazines during the bench conference, therefore preserving this issue for appellate review. Peede furthers the argument by stating that when the State moved to introduce its next exhibit, nude photographs, into evidence, Peede's counsel objected as to relevancy and predicate.

This Court has held that the fact that there are unreported parts of proceedings in a record does not prejudice an appeal. See Turner v. Dugger, 614 So.2d 1075, 1080 (Fla.1992) ("[T]he fact that bench conferences were not reported did not prejudice the appeal.") (citing Morgan v. State, 415 So.2d 6, 8-9 (Fla. 1982)). Moreover, even if there was error in the unreported bench conference in this case where Peede's counsel allegedly objected to the State's introduction of nude magazines, this error was harmless and therefore not prejudicial.